**Kenneth D. HUFFMAN, Petitioner,**

v.

**OFFICE OF PERSONNEL MANAGEMENT,
Respondent.**

**No. 00–3184.**

United States Court of Appeals,
Federal Circuit.

Aug. 15, 2001.

James M. Eisenmann, Passman & Kaplan, P.C., of Washington, DC, argued for petitioner.

James C. Caine, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for respondent. With him on the brief were David M. Cohen, Director; and Kathryn A. Bleecker, Assistant Director.

Before MAYER, Chief Judge, BRYSON, and DYK, Circuit Judges.

DYK, Circuit Judge.

■ This case presents three issues: 1) whether complaints to a supervisor about the supervisor's wrongful conduct constitute disclosures under the Whistleblower Protection Act of 1989, Pub.L. No. 101–12, 103 Stat. 16 (codified in scattered sections of 5 U.S.C.) ("WPA" or "Act"); 2) whether complaints to a supervisor about the wrongful conduct of other agency employees or other misconduct constitute disclosures under the WPA; and 3) whether reports made as part of an employee's normal work duties constitute disclosures under the WPA. We hold that complaints to a supervisor about the supervisor's own conduct are not disclosures covered by the WPA, but that complaints to a supervisor about other employees' conduct or other misconduct may be disclosures covered by the WPA. We also hold that reports made as part of an employee's assigned normal job responsibilities are not covered by the WPA when made through normal channels. Accordingly, we affirm in part, vacate in part, and remand the decision of the Merit Systems Protection Board ("Board") dismissing the appeal for lack of jurisdiction.

## BACKGROUND

On July 17, 1998, Kenneth D. Huffman ("petitioner") filed a complaint with the Office of Special Counsel ("OSC") alleging

that he had been removed from his position as Assistant Inspector General by his employer, the Office of the Inspector General ("OIG") for the Office of Personnel Management ("agency"), for making disclosures protected by the WPA. Petitioner alleged that he made "protected disclosures" to his supervisor—Patrick McFarland, the Inspector General of the agency—on a number of occasions.

Petitioner alleged that he made these protected disclosures in four memoranda addressed to McFarland. First, petitioner alleged that he made a protected disclosure in a July 22, 1997, memorandum to McFarland which included allegations that McFarland improperly preselected an agency employee for a senior executive service ("SES") position. Petitioner further asserted that the July 22, 1997, memorandum made other protected disclosures when he reminded McFarland "that he had confronted [McFarland] in the past concerning instances of abuse of authority and gross mismanagement by various OIG managers."

Petitioner alleged that he made a second protected disclosure in a May 22, 1998, memorandum to McFarland in which petitioner urged that the OIG "had circumvented merit system principles when it hired certain auditors . . . as 'program analysts' under direct hire authority, without competition." Petitioner alleged that hiring these people without competition was "a violation of law, rule, or regulation."

Petitioner also claimed that he "again raised allegations which he reasonably believed constituted a gross waste of funds and gross mismanagement" by McFarland in a May 29, 1998, memorandum to McFarland. In this memorandum, petitioner expressed his disagreement with a services contract between the OIG and an

organization known as All Star Personnel, to perform an organizational study, urging "that it would be a gross waste of taxpayer money to continue to pay All–Star Personnel for their contracting services to provide an organizational assessment of the OIG."

Finally, petitioner claimed that he had "advanced numerous instances of conduct which he reasonably believed constituted a violation of law, rule, or regulation, gross mismanagement and abuse of authority" in a June 18, 1998, memorandum to McFarland regarding the workplace behavior of other OIG employees. Among other things, petitioner alleged that the Deputy Assistant Inspector General for Audits directed three auditors who were hired under the special hiring authority of the agency's Outstanding Scholar Program to falsify their government employment applications (SF–171s).

On October 16, 1998, the OSC closed its inquiry, finding that petitioner did not make any disclosures protected under the WPA, and informed petitioner of his right to seek corrective action from the Board.

On December 21, 1998, petitioner filed an Individual Right of Action ("IRA") appeal with the Board. The administrative judge of the Board issued an initial decision on March 25, 1999, holding that the Board did not have jurisdiction because petitioner's alleged disclosures were not the type of disclosures protected by the WPA. *Huffman v. Office of Pers. Mgmt.*, No. DC–1221–99–0178–W–1 (M.S.P.B. Mar.25, 1999) (initial decision). Relying on *Willis v. Department of Agriculture*, 141 F.3d 1139, 1143 (Fed.Cir.1998), and *Horton v. Department of Navy*, 66 F.3d 279, 282 (Fed.Cir.1995), the administrative judge held that petitioner's "reports to McFarland, his supervisor, are not disclo-

sures of the type the WPA was designed to encourage and protect." *Huffman,* slip op. at 5. The administrative judge reasoned:

> In complaining to McFarland, the [petitioner] merely was expressing disagreement with McFarland's responses (or lack thereof) to the [petitioner's] suggestions and advice and McFarland's interpretation and implementation of certain OIG policies and procedures. The [petitioner] took no action to bring an issue to the attention of authorities in a position to correct fraudulent or illegal activity. *See Willis,* 141 F.3d at 1143. Further, there is no evidence that the [petitioner] made disclosures that would lead McFarland to rationally believe that he might be subjected to discipline.

*Id.,* slip op. at 6. The administrative judge therefore held that because petitioner's alleged disclosures were not made to persons in a position to correct the alleged wrongs, the memoranda were not protected disclosures under the WPA, citing *Willis.* *Id.* The administrative judge did not distinguish between the complaints made to McFarland about other employees, and those made to McFarland about McFarland himself.

The administrative judge further noted that even if the memoranda had been given to someone in authority (besides his supervisor, McFarland), "none of those disclosures involved alleged instances of gross mismanagement, gross waste of funds, or abuse of authority" as required by the WPA. *Id.* Finally, the administrative judge found that in relating his views on various matters to his supervisor, petitioner "did no more than carry out his required everyday job responsibilities," and held that under *Willis,* a disclosure cannot be protected by the WPA if an employee is merely performing his required duties. *Id.,* slip op. at 7. Accordingly, the administrative judge dismissed the appeal for lack of jurisdiction.

Petitioner petitioned for review to the full Board, but the Board denied his petition. *Huffman v. Office of Pers. Mgmt.,* 84 M.S.P.R. 569, 570 (1999) (final order). Then Vice Chair Slavet issued a concurring opinion in which she recognized that the Board is required to follow this court's precedent in *Willis* and *Horton* that disclosures are not protected if made to the alleged wrongdoer himself, but opined that those cases were wrongly decided because the WPA protects reports of wrongdoing to the alleged wrongdoer. *Id.* at 571–74 (Slavet, then-Vice Chair, concurring). Moreover, then-Vice Chair Slavet urged that nothing in the legislative history of the WPA indicated that Congress intended to require an employee to go over his supervisor's head or outside his organization for the disclosure to be protected. *Id.* at 576–77. She noted that she would affirm on the ground that petitioner's alleged disclosures did not disclose gross mismanagement or violation of law, rule, or regulation, but were mere disagreements with his supervisor's decisions. *Id.* at 578–80. The timely petition for review to this court followed.

## DISCUSSION

### I

Decisions of the Board must be sustained unless they are arbitrary, capricious, an abuse of discretion, not in accordance with law, obtained without procedures required by rule, law, or regulation, or unsupported by substantial evidence. 5 U.S.C. § 7703(c); *Hayes v. Dep't of the Navy,* 727 F.2d 1535, 1537 (Fed.Cir.1984).

■ To maintain an IRA under the WPA, a petitioner must establish Board jurisdiction by exhausting administrative remedies before the OSC and making non-frivolous allegations that "(1) he engaged in whistleblowing activity by making a protected disclosure under 5 U.S.C. § 2302(b)(8), and (2) the disclosure was a contributing factor in the agency's decision to take or fail to take a personnel action as defined by 5 U.S.C. § 2302(a)." *Yunus v. Dep't of Veterans Affairs*, 242 F.3d 1367, 1371 (Fed.Cir.2001).

■■ In the absence of a protected disclosure, the Board is without jurisdiction to entertain an IRA appeal under the WPA. *Ellison v. Merit Sys. Prot. Bd.*, 7 F.3d 1031, 1034 (Fed.Cir.1993). Whether the Board possessed jurisdiction is a question of law which we review without deference. *Herman v. Dep't of Justice*, 193 F.3d 1375, 1378 (Fed.Cir.1999).

## II

This case presents important questions under the WPA. The issue is whether the Board erred in dismissing petitioner's appeal on the ground that his reports were not protected disclosures pursuant to 5 U.S.C. § 2302(b)(8), as required for Board jurisdiction under 5 U.S.C. § 1221(a).

At the outset, this case requires us to interpret the WPA in two separate contexts: first, where complaints are made by an employee to a supervisor about the conduct of the supervisor, and, second, where complaints are made to a supervisor about the conduct of other government employees or about other matters within the scope of the WPA.

■ The WPA makes it a prohibited personnel action to take or fail to take a personnel action because of "*any* disclosure of information by an employee or applicant which the employee or applicant reasonably believes evidences—(i) a violation of any law, rule, or regulation, or (ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety." 5 U.S.C. § 2302(b)(8)(A) (1994) (emphasis added). Petitioner correctly points out that this language—"any disclosure"—was deliberately broad. The predecessor version of the current statute, enacted by the Civil Service Reform Act of 1978, Pub.L. No. 95–454, 92 Stat. 1111, was narrower, reciting that it was only a prohibited personnel action to take or fail to take a personnel action because of "*a* disclosure of information by an employee." 5 U.S.C. § 2302(b)(8)(A) (Supp. III 1979) (emphasis added).[1] The Whistleblower Protection Act of 1989 amended this language to broaden the scope of disclosures covered by the WPA from "*a* disclosure" to "*any* disclosure." Pub.L. No. 101–12, § 4(a)(3), 103 Stat. 32 (emphases added). The Senate Committee on Governmental Affairs explained the change as follows:

> The Committee intends that disclosures be encouraged. The OSC, the Board and the courts should not erect barriers to disclosures which will limit the necessary flow of information from employees

1. This legislative history of this law relates to a version of the WPA that President Reagan pocket-vetoed after the 100th Congress adjourned. In the 101st Congress, the WPA was reintroduced, passed, and signed into law on April 17, 1989. Congress did not release committee reports, but it is proper for us to look to the legislative history from the 100th Congress for guidance in interpreting the WPA, because the language did not change. *See Amin v. Merit Sys. Prot. Bd.*, 951 F.2d 1247, 1250 n. 1 (Fed.Cir.1991).

who have knowledge of government wrongdoing. For example, it is inappropriate for disclosures to be protected only if they are made for certain purposes or to certain employees or only if the employee is the first to raise the issue. [The Senate bill] emphasizes this point by changing the phrase "a disclosure" to "any disclosure" in the statutory definition. This is simply to stress that any disclosure is protected (if it meets the requisite reasonable belief test and is not required to be kept confidential).

S.Rep. No. 100–413, at 13 (1988) (italics in original).

Congress later amended section 2302 and other sections of the WPA in 1994. Among other things, the 1994 amendment expanded whistleblower protection by adding "a decision to order psychiatric testing or examination," and "any other significant change in duties, responsibilities, or working conditions" to the list of prohibited personnel actions in 5 U.S.C. § 2302(a)(2)(A). Pub.L. No. 103–424, § 5(a)(2), 108 Stat. 4361, 4363 (1994). The disclosure language of 5 U.S.C. § 2302(b)(8)(A)(i) was not itself amended in 1994, and, as we discuss below, this post-enactment legislative history concerning this unamended provision has little value in interpreting the statute. However, we note that the committees in 1994 criticized the Board for continuing to take a narrow view of what constitutes a protected disclosure. For example, the House report for the 1994 amendment stated:

Perhaps the most troubling precedents involve the Board's inability to understand that "any" means "any." The WPA protects "any" disclosure evidencing a reasonable belief of specified misconduct, a cornerstone to which the

MSPB remains blind. The only restrictions are for classified information or material the release of which is specifically prohibited by statute. Employees must disclose that type of information through confidential channels to maintain protection; otherwise there are no exceptions.

H.R. Rep. 103–769, at 18 (1994). So too the Senate report stated:

As indicated above, the plain language of the Whistleblower Protection Act extends to retaliation for "any disclosure", regardless of the setting of the disclosure, the form of the disclosure, or the person to whom the disclosure is made.

S.Rep. No. 103–358, at 11 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3549, 3559.

### A. Complaints to a Supervisor About the Supervisor's Conduct

■ In our decisions in *Willis* and *Horton*, we held that the WPA does not apply where an employee makes complaints to the employee's supervisor about the supervisor's own conduct. In *Willis*, the aggrieved employee—William Willis—sent letters to his supervisor in which Willis was critical of the supervisor. *Willis*, 141 F.3d at 1141. The agency thereafter ordered Willis to be reassigned, but he refused to accept the assignment and eventually retired. *Id.* This court held that Willis's letters to his supervisor did not qualify as protected disclosures. In so holding, this court stated:

Discussion and even disagreement with supervisors over job-related activities is a normal part of most occupations. It is entirely ordinary for an employee to fairly and reasonably disagree with a supervisor who overturns the employee's decision. In complaining to his supervi-

sors, Willis has done no more than voice his dissatisfaction with his superiors' decision.

*Id.* at 1143. The court therefore held that "Willis's disclosures to his immediate supervisors are not protected disclosures for the purposes of the WPA." *Id.*

In *Horton,* the appellant—John Horton—had previously criticized the behavior of several fellow library staff members, including his supervisor, to the staff members themselves as well as to his supervisor. *Horton,* 66 F.3d at 281. Mr. Horton's supervisor issued several warnings, at least one of which in writing, to Mr. Horton based on what the supervisor perceived as a confrontational attitude. *Id.* After an incident in which Mr. Horton allegedly had a "tantrum" regarding a fellow library staff member, the supervisor initiated a removal action. *Id.* This court held that Mr. Horton's verbal and written criticisms "were not the 'disclosure' contemplated by statute, for these criticisms were made directly to the persons about whose behavior Mr. Horton complained." *Id.* at 282. We further noted that an allegation "directed to the wrongdoers themselves is not normally viewable as whistleblowing" under the WPA and that criticism directed directly at the wrongdoers does not further the purpose of the WPA "to encourage disclosure of wrongdoing to persons who may be in a position to act to remedy it, either directly by management authority, or indirectly as in disclosure to the press." *Id.*

■ Petitioner urges that these cases were incorrectly decided in light of the language of the statute and the legislative history described above, and points out that those decisions did not explicitly attempt to reconcile the statutory interpretation with the language of the WPA. We are, of course, bound by *Willis* and *Horton,* but even if we were not, we could not agree with petitioner. The WPA by its terms requires that the employee have made a "disclosure" to trigger the protection of the Act. While that term is not explicitly defined in the statute, it is a basic principle of statutory interpretation that undefined terms in a statute are deemed to have their ordinarily understood meaning. *United States v. James,* 478 U.S. 597, 604, 106 S.Ct. 3116, 92 L.Ed.2d 483 (1986); *Int'l Bus. Machs. Corp. v. United States,* 201 F.3d 1367, 1372 (Fed.Cir.2000); *Best Power Tech. Sales Corp. v. Austin,* 984 F.2d 1172, 1177 (Fed. Cir.1993). For that meaning, it is appropriate to consult dictionaries. *Int'l Bus. Machs.,* 201 F.3d at 1372; *Best Power Tech. Sales,* 984 F.2d at 1177.

■ The term "disclosure" is defined in *Webster's Dictionary* as "the act or an instance of disclosing: the act or an instance of opening up to view, knowledge, or comprehension." *Webster's Third New International Dictionary* 645 (1968). That dictionary further defines "disclose" as: "2a: to expose to view ...: lay open or uncover (something hidden from view) <excavations disclosed many artifacts> b: to make known: open up to general knowledge." *Id.* (italics in original). *See also Black's Law Dictionary* 477 (7th ed.1999) (defining "disclosure" as: "The act or process of making known something that was previously unknown; a revelation of facts"); *Random House Webster's Unabridged Dictionary* 562 (2d ed.1998) (defining "disclose" as: "1. to make known; reveal or uncover: to disclose a secret. 2. to cause to appear; allow to be seen; lay open to view." (italics in original)). In other words, the term "disclosure" means

to reveal something that was hidden and not known. It is also quite significant that Congress in the WPA did not use a word with a broader connotation such as "report" or "state."

 When an employee reports or states that there has been misconduct by a wrongdoer to the wrongdoer, the employee is not making a "disclosure" of misconduct. If the misconduct occurred, the wrongdoer necessarily knew of the conduct already because he is the one that engaged in the misconduct.[2] The policies of the WPA hardly require a different result. The purpose of the statute is to encourage disclosures that are likely to remedy the wrong. *Horton,* 66 F.3d at 282; *Willis,* 141 F.3d at 1143. The wrongdoer is not such a person. Extending the WPA to cover reports to a supervisor of the supervisor's own misconduct would also have drastic adverse consequences. As we stated in *Willis,* "[d]iscussion and even disagreement with supervisors over job-related duties is a normal part of most occupations." *Willis,* 141 F.3d at 1143. If every complaint made to a supervisor concerning an employee's disagreement with the supervisor's actions were considered to be a disclosure protected under the WPA, virtually every employee who was disciplined could claim the protection of the Act. Although Congress intended that the WPA's coverage be broad, we think it unlikely that Congress intended the Act to extend that far, and we hold that it did not.

**B. Complaints to a Supervisor About Other Employees' Conduct or Other Matters**

Both parties agree that two of the reports involved complaints to McFarland about persons other than McFarland himself. First, the May 22, 1998, memorandum alleged that OIG employees had impermissibly hired certain auditors under the agency's Outstanding Scholars Program, rather than filling the positions through open competition. Second, the June 18, 1998, memorandum alleged that the Deputy Assistant Inspector General for Audits directed three OIG auditors who were "impermissibly" hired under the Outstanding Scholars Program to "falsify" their government employment applications.

The administrative judge below and the government's brief both suggest that reports of wrongdoing are not protected if they are not made to persons in a position to correct the alleged wrongdoing. The administrative judge apparently concluded that petitioner's supervisor here somehow lacked the authority to correct wrongdoing by the other employees. In holding that complaints to a supervisor about the supervisor's own wrongdoing are not protected under the WPA, this court in *Willis* and *Horton* stated that reports must be made to persons in a position to act to remedy the alleged wrongdoing. *Willis,* 141 F.3d at 1143 (noting that "[Willis] has taken no action to bring an issue to the attention of

2. To be sure, there may be situations where a government employee reports to the wrongdoer that the conduct of the wrongdoer is unlawful or improper, and the wrongdoer, though aware of the conduct, was unaware that it was unlawful or improper. Nonetheless, the report would not be a protected disclosure. It is clear from the statute, 5 U.S.C. § 2302(b)(8)(A), that the disclosure must pertain to the underlying conduct, rather than to the asserted fact of its unlawfulness or impropriety, in order for the disclosure to be protected by the WPA. 5 U.S.C. § 2302(b)(8)(A) refers to "any disclosure of information by an employee or applicant *which the employee or applicant reasonably believes* evidences ... a violation of any law, rule, or regulation...." (Emphasis added).

authorities in a position to correct fraudulent or illegal activities" and that "Willis's disclosures were not made to persons in a position to correct the alleged abuse"); *Horton*, 66 F.3d at 282 ("The purpose of the Whistleblower Protection Act is to encourage disclosure of wrongdoing to persons who may be in a position to act to remedy it, either directly by management authority, or indirectly as in disclosure to the press."). These statements were read too broadly in the Board decision below and in other decisions of the Board. *See, e.g., Langer v. Dep't of the Treasury*, No. CH–1221–99–0540–W–1, slip op. at 7 (M.S.P.B. Oct.12, 1999), *aff'd*, No. 00–3388, 2001 WL 694555 (Fed.Cir. June 20, 2001) (nonprecedential opinion).

▆▆▆▆ *Willis* and *Horton* do not require that the reports must be made to a person with actual authority to correct the wrong. Indeed, *Horton* itself and the legislative history of the WPA recognize that disclosures to the press are protected. *Horton*, 66 F.3d at 282 (noting that disclosures to the press may be protected disclosures); H.R.Rep. No. 100–413, at 12–13 (1988) (listing the media as an independent entity, such as the inspector general and Congress, to which disclosures may be made). No requirement of actual authority is found in the language of the statute, and we think it is quite clear that reports do not need to be made to those with authority to correct the alleged wrongdoing in order to be protected by the WPA. Any government employee, in a supervisory position, other than the wrongdoer himself, is in a position to "correct" or "remedy" the abuse by bringing the matter to the attention of a higher authority. To be consistent with the statute and its purposes, complaints to supervisors concerning wrongdoing by other employees or oth-

er matters within the scope of the WPA should be encouraged and not discouraged, even if the supervisor himself lacks authority to directly correct the wrongdoing. Such complaints constitute disclosures under the WPA, if, of course, they also meet the other requirements of the statute.

### III

Alternatively, with respect to the May 22, 1998, and June 18, 1998, disclosures, the government argues that reports of misconduct are not covered by the WPA if the disclosures are part of the employee's normal duties. The government argues that reports of misconduct by petitioner here were part of his normal duties. The government relies principally on *Willis*, where the employee made several claims of protected disclosures. As for the first alleged disclosure in *Willis*, as noted above, we held that a complaint made to the employee's supervisor about the supervisor's own conduct could not be a protected disclosure. *Willis*, 141 F.3d at 1143. Willis also alleged that his finding that several farms were out of compliance with Department of Agriculture approved conservation plans was a protected disclosure under the WPA. As for this alleged disclosure, we held that Willis's mere performance of his "required everyday job responsibilities" was not a protected disclosure under the WPA, because Willis "cannot be said to have risked his personal job security by merely performing his required duties." *Id.* at 1144. We noted that all government employees are expected to perform their required everyday job responsibilities "pursuant to the fiduciary obligation which every employee owes to his employer." *Id.*

Admittedly our jurisprudence on the normal duties question has not always

been clear, and it is possible to find conflicting statements in dictum concerning the normal duties issue.[3] However, in *Willis* we specifically held that an employee who makes disclosures as part of his normal duties cannot claim the protection of the WPA. *Id.* at 1144.

 It is important, however, to distinguish three quite different situations. *First,* there is the situation in which the employee has, as part of his normal duties, been assigned the task of investigating and reporting wrongdoing by government employees and, in fact, reports that wrongdoing through normal channels. A law enforcement officer whose duties include the investigation of crime by government employees and reporting the results of an assigned investigation to his immediate supervisor is a quintessential example. Employees of an inspector general's office may be in a similar position. *Willis* holds that reporting in connection with assigned normal duties is not a protected disclosure covered by the Act. *Id.* While the language of the Act is ambiguous as to whether normal duties reports are covered, the core purposes of the WPA are simply not

implicated by such reporting. Extending the WPA's protections to such situations would be inconsistent with the WPA's recognition of the importance of fostering the performance of normal work obligations and subjecting employees to normal, nonretaliatory discipline.[4] *See* S.Rep. No. 100–413, at 15 (1988) ("The Committee does not intend that employees who are poor performers escape sanction by manufacturing a claim of whistleblowing . . ."); S.Rep. No. 95–969, at 8, *reprinted in* 1978 U.S.C.C.A.N. 2723, 2730–31 ("Nor would the bill protect employees who claim to be whistle blowers in order to avoid adverse action based on inadequate performance."). While dictionary definitions of the term "disclosure" obviously provide little assistance in determining whether Congress intended normal duties to be covered by the WPA, it is appropriate for us to interpret the statute in light of its central purpose. *See Crandon v. United States,* 494 U.S. 152, 158, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990) (holding that, in order to fully understand the meaning of a statute, it is proper to look "not only to the particular statutory language, but to the design of the statute as a whole and to its object and

---

3. In addition to *Willis,* see *Watson v. Department of Justice,* 64 F.3d 1524, 1530 (Fed.Cir. 1995) (holding that disclosures "made as part of an employee's duties," may be protected by the Act, but stating that "the employee may nevertheless be disciplined for violating agency policy") and *Marano v. Department of Justice,* 2 F.3d 1137, 1142 (Fed.Cir.1993) (stating that "[t]he WPA . . . applies to the situation where a government employee discusses information that is closely related to the employee's day-to-day responsibilities").

4. The framework established by the legislature for an employee to demonstrate that a disclosure was a contributing factor in the personnel decision further supports our decision. Under 5 U.S.C. § 1221(e)(1), as amended in 1994, an "employee may demonstrate that the disclosure was a contributing factor

in the personnel action through circumstantial evidence, such as evidence that—(A) the official taking the personnel action knew of the disclosure; and (B) the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action." In a situation where the normal duties of the employee include investigation and reporting, the employer would by the very nature of the employment know of the report, because the employee reports to his employer, and, if there were a time proximity (the second factor), a prima facie case would automatically be proven. Any discipline would be presumptively illegal under the WPA. We find it highly unlikely that Congress intended this result.

policy"); *Massachusetts v. Morash,* 490 U.S. 107, 115, 109 S.Ct. 1668, 104 L.Ed.2d 98 (1989) (noting that "in expounding a statute, we [are] not ... guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy") (brackets and ellipses in original) (quoting *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 51, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987)); *Doyon Ltd. v. United States,* 214 F.3d 1309, 1314 (Fed. Cir.2000).

▇▇▇ We find no clear evidence in the legislative history of the WPA, apart from the history of the 1994 amendment discussed below, that the WPA was designed to trigger protection for performance of normal duties. The WPA was established to protect employees who go above and beyond the call of duty and report infractions of law that are hidden.[5] The situations which Congress specifically covered in 1978 and 1989 were disclosures to the press or to Congress itself. *See, e.g.,* S.Rep. No. 100–413, at 12–13 (1988) (discussing disclosures to the media and Congress); S. Conf. Rep. No. 95–1272, at 131–132 (1978) (discussing disclosures to Congress); 95 Cong. Rec. H8473 (daily ed. Aug. 11, 1978) (statement of Rep. Schroeder) (discussing statements made to a congressional committee). As we previously stated in *Willis,* "the WPA is intended to protect government employees who risk their own personal job security for the advancement of the public good by disclosing abuses by government personnel." *Willis,* 141 F.3d at 1144.

▇▇ Petitioner points to statements about the normal duties issue made during consideration of the 1994 amendments to the WPA. For example, the 1994 Senate Committee Report stated:

> In response to post-hearing questions from Senator Pryor, OSC indicated that some administrative judges of the Merit Systems Protection Board may still not understand the law on this point. The OSC letter states:
>
>> I assume that this question is concerned with whether or not an employee can be considered a whistleblower when the employee, in the course of doing his job, passes along certain information to his regular supervisors; for example, a government auditor whose report shows a waste of funds turns in his report to his supervisor, who accepts it for routine processing. In this example the law is unclear whether the employee has made a protected disclosure. At least two administrative judges of the Merit Systems Protection Board (MSPB) have ruled that such activity is not protected whistleblowing. Nonetheless, the MSPB to the best of our knowledge has not yet issued a final decision on this issue.
>
> As indicated above, the plain language of the Whistleblower Protection Act extends to retaliation for "any disclosure", regardless of the setting of the disclosure, the form of the disclosure, or the person to whom the disclosure is made.

S.Rep. No. 103–358, at 11 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3549, 3559. Similarly, on the floor Representative McCloskey stated:

---

5. The Senate Report on the Civil Service Reform Act of 1978 points out the difficulty in exposing government illegality, waste, and corruption unless someone speaks up, stating that: "[i]n the vast Federal bureaucracy it is not difficult to conceal wrongdoing provided no one summons the courage to disclose the truth." S.Rep. No. 95–969, at 8 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2723, 2730.

*A protected disclosure may be made as part of an employee's job duties,* may concern policy or individual misconduct, and may be oral or written and to any audience inside · or outside the agency, without restriction to time, place, motive, or context.

140 Cong. Rec. H29353 (daily ed. Oct. 7, 1994) (statement of Rep. McCloskey) (emphasis added). But, as we have noted above, in 1994 the disclosure provisions were not amended. These post-enactment statements made in the legislative history of the 1994 amendment have no bearing on our determination of the legislative intent of the drafters of the 1978 and 1989 legislation. It is well-established that "the view of a later Congress cannot control the interpretation of an earlier enacted statute." *O'Gilvie v. United States,* 519 U.S. 79, 90, 117 S.Ct. 452, 136 L.Ed.2d 454 (1996); *United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 4 L.Ed.2d 334 (1960) ("[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one."). The Supreme Court has specifically held that statements made in the context of a later amendment to a statute that does not amend the portion of the statute at issue in the case, "are in no sense part of the legislative history." *Oscar Mayer & Co. v. Evans,* 441 U.S. 750, 758, 99 S.Ct. 2066, 60 L.Ed.2d 609 (1979) (stating that "[i]t is the intent of the Congress that enacted [the section] ... that controls") (brackets and ellipses in original) (*quoting Teamsters v. United States,* 431 U.S. 324, 354 n. 39, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)). Indeed, it could be viewed as significant that Congress in 1994 did not amend the language of section 2302 to address this issue, thus leaving the mat-ter for judicial resolution under the existing language of the Act. Under the circumstances, we are convinced that *Willis* was correctly decided on the issue of normal duties; and we turn to the other relevant categories.

■ *Second,* there is the situation in which an employee with such assigned investigatory responsibilities reports the wrongdoing outside of normal channels. An example is a law enforcement officer who is responsible for investigating crime by government employees who, feeling that the normal chain of command is unresponsive, reports wrongdoing outside of normal channels. This is clearly a disclosure protected by the Act, and the Act's core purposes are served by such a disclosure.

■ *Third,* there is the situation in which the employee is obligated to report the wrongdoing, but such a report is not part of the employee's normal duties or the employee has not been assigned those duties.[6] The government argues here that the petitioner was obliged here to report all wrongdoing, without regard to his responsibility to investigate it, and that his reports of wrongdoing are not protected disclosures. We cannot accept the government's contention. A report may be a disclosure protected by the Act, though the employee can also be disciplined for failure to make the report. This is the holding of *Watson v. Department of Justice,* 64 F.3d 1524, 1530 (Fed.Cir.1995).

It is unclear from the Board's decision whether the reports of May 22, 1998, and June 18, 1998, concerning the conduct of other employees fall into the first, second, or third categories. We remand to the

6. For example, the regulations, 5 C.F.R. § 2635.101(b)(11), specifically require all employees to "disclose waste, fraud, abuse, and corruption to appropriate authorities."

Board for consideration of this issue under the appropriate standard, which we have articulated above.

## IV

█ Finally, the government argues that even if petitioner had met all of the other requirements of the WPA, none of the disclosures involved alleged instances of gross mismanagement, gross waste of funds, or abuse of authority. This is simply not true. The allegations made by petitioner, such as falsification of government documents and illegal hiring practices, are sufficiently serious to constitute gross mismanagement, gross waste of funds, or an abuse of authority. Therefore, we reject the administrative judge's reliance on this alternate ground for dismissing the case.

█ The government similarly argues that petitioner did not have a "reasonable belief" as required by the statute regarding many of the alleged disclosures. The WPA requires that the employee have a reasonable belief that he is disclosing: 1) a violation of law, rule, or regulation; or 2) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety. 5 U.S.C. § 2302(b)(8)(A); *Lachance v. White*, 174 F.3d 1378, 1380–81 (Fed.Cir.1999); *Frederick v. Dep't of Justice*, 73 F.3d 349, 352 (Fed.Cir.1996). Specifically, the government argues that petitioner could not have a reasonable belief that he was disclosing a violation or gross mismanagement because several of the disclosures were apparently based on rumor, namely the May 22, 1998, disclosure concerning the practice of hiring analysts and "impermissibly" converting them into auditors, and the June 18, 1998, disclosure

concerning the Deputy Assistant Inspector General for Audits instructing employees to falsify their government employment applications. The government urges that if petitioner does not have a factual basis for an allegation, he cannot have made a protected disclosure, citing *Frederick*, 73 F.3d at 353. Unfortunately, the Board failed to determine if petitioner presented evidence of his reasonable belief concerning these disclosures. We decline the government's invitation to decide the reasonable belief question in the first instance. We remand to the Board to address the issue of whether petitioner had the required reasonable belief with respect to the allegations.

## CONCLUSION

For the foregoing reasons, we affirm the Board's determination that the complaints by petitioner to his supervisor are not protected disclosures under the WPA, but vacate and remand as to the complaints to the supervisor about other employees, for a determination as to whether these are protected disclosures under the WPA.

*AFFIRMED–IN–PART, VACATED–IN–PART, AND REMANDED.*

## COSTS

No costs.