26 A.3d 866

Tyrone LAWSON

v.

BOWIE STATE UNIVERSITY.

No. 119, Sept. Term, 2010.

Court of Appeals of Maryland.

Aug. 16, 2011.

246

Hillary Galloway Davis (Davis & Associates Law Offices, P.A., Towson, MD), on brief, for appellant.

Corlie McCormick, Jr., Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for appellee.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

ADKINS, J.

In this case we must determine whether whistleblower protections extend to an employee whose decision to disclose possible violations was personally motivated by his desire to "make changes to the department" in which he worked. The employee, Tyrone Lawson, was a seventeen-year veteran of the Bowie State University Police Department ("the Department") until his termination for violating the Department's

chain of command policy. Specifically, Lawson had drafted a letter disclosing potential abuses by his fellow officers and, feeling unable to report these violations to the Department's Chief of Police, he presented the letter to the school's Vice President of Student Affairs. The Vice President notified the Department Chief of the contents of Lawson's letter, leading the Department Chief to fire Lawson for, among other things, insubordination.

Following his termination, Lawson sought relief through the administrative channels, arguing that he was entitled to whistleblower protection because the letter constituted a "protected disclosure" as contemplated by Section 5–305 of the Maryland State Personnel and Pensions Article. An Administrative Law Judge ("ALJ") considered the matter, and concluded that Lawson's letter was not a "protected disclosure" because it was drafted as part of Lawson's personal "crusade" to improve the Department, rather than for the purpose of notifying a higher authority of a potential violation. The Circuit Court for Prince George's County affirmed the ALJ's decision, and Lawson appealed to the Court of Special Appeals. Before argument in that Court, however, we issued a writ of certiorari to determine:

> Whether the ALJ erred in failing to find that [Lawson] made a protected disclosure under State Personnel and Pensions Section 5–305[.] [1]

We shall hold that the ALJ improperly conflated Lawson's personal motivation for disclosure with the statutory requirement that an employee have a reasonable belief that the

---

1. Md.Code (1993, 2004 Repl.Vol.), § 5–305 of the State Personnel and Pensions Article ("SPP") provides in relevant part:

 [A] supervisor, appointing authority, or the head of a principal unit may not take or refuse to take any personnel action as a reprisal against an employee who:

 (1) discloses information that the employee reasonably believes evidences:

 (i) an abuse of authority, gross mismanagement, or gross waste of money;

 (ii) a substantial and specific danger to public health or safety; or

 (iii) a violation of law[.]

information disclosed evidences a violation. Accordingly, we shall reverse the judgment of the Circuit Court affirming the ALJ.

## FACTS AND LEGAL PROCEEDINGS

### A. The Alleged Abuse of Power

In February 2007, following concerns about a "lack of leadership" within the Bowie State University ("the University") Police Department, Dr. Artie Travis, the University's Vice President of Student and Academic Affairs, offered to meet individually with University police officers to give them an opportunity to discuss the Department's strengths and weaknesses "outside of the chain of command." Travis informed Department officers that he would not discuss the content of the individual meetings with the Department Chief "unless there [was] something that [was] very clear" that needed to be brought to the Chief's attention. Dr. Travis assured the officers that the meetings were not in violation of the "chain of command" rules of the Department's Code of Conduct.

After receiving Dr. Travis's general invitation, Lawson attempted to set up a meeting to discuss his concerns about the Department. At first, Travis' secretary had difficulty accommodating Lawson's request "to be one of the last [officers] to . . . have a discussion with Dr. Travis." Later, Lawson spoke to Travis informally at a basketball game around February 25, 2008 and arranged to meet with him on March 6.

Two days after the basketball game, but still before Lawson and Dr. Travis's scheduled meeting, Lawson learned of an arrest conducted by Department officers Corporal Marc Ducellier and Sergeant David Blue, where the officers took into custody a non-student during their foot patrol earlier in the day. Lawson was first alerted to the arrest when Police Department Chief Ernest Waiters sent out a Department-wide e-mail congratulating the officers. Waiters' e-mail explained that Ducellier and Blue had been on a "proactive foot patrol[ ]" of Christa McAuliffe Residence ("CMRC"), a University residence hall, when they found the suspect in a dormitory

room with glass vials stored with marijuana and "money packaged in a manner [indicating] 'Possession With Intent to Distribute.'"

According to Lawson, he became concerned about the propriety of the arrest during a later discussion with Ducellier and Blue.[2] Lawson claimed that Ducellier told him that the officers had actually been doing an inspection of CMRC, and were "turning the door knobs to our resident student rooms and pushing on the doors to see if the doors were unlocked or slightly ajar ... [and then] walk[ing] uninvited inside[.]" Lawson alleged that Ducellier and Blue laughed and joked about waking up residents, and about how "some of the female residents came out of their bedrooms and into the living room half dress[ed] and partially nude." Lawson claims that Ducellier explained to him that they had found the suspect in Suite 405 of CMRC after the door "just came fully open" in response to his knock, and that they smelled marijuana only after they entered the room. Following his conversation with the officers, Lawson conducted his own independent investigation of CMRC, and he discovered that the doors automatically shut on their own when residents left their rooms, such that it would be impossible for a door to be left ajar or to be opened by the force of a knock.

Lawson also spoke with two other officers, Corporal Mike Milburn and Sergeant Anina Brown, about the arrest. According to Milburn and Brown, at the end of their shift on the morning of the arrest, they encountered Ducellier and Blue in a parking lot with a prisoner in their vehicle. Both would later testify that Ducellier and Blue did not respond when asked about what prompted the arrest, but sarcastically told them that, "the guy was arrested for standing around and acting stupid." Milburn testified that he was surprised when he saw the prisoner, since normal procedure is to alert the Department dispatcher when an arrest has been made and Milburn had not heard of the arrest "over the air[.]" Like-

---

2. Both Ducellier and Blue testified that they never discussed the circumstances of the arrest with Lawson.

wise, Brown testified that officers would usually send out a request call for help before making an arrest at CMRC because of the building's size and history of violent incidents. Brown alleged that she was annoyed by Blue's sarcasm in the parking lot, and when she approached him about it later, he apologized and "said that he just didn't want to say anything in front of [Milburn] because [Ducellier's probable cause related to the CMRC arrest] was weak."

### B. Lawson's Letter to Dr. Travis

After speaking with Milburn and Brown and investigating the doors into CMRC himself, Lawson wrote a letter to Travis with the subject line "Re: Alleged University Police Corruption and Misconduct." The letter detailed Lawson's concerns about the arrest, namely that Blue and Ducellier had apparently made the arrest after entering the room without probable cause. Lawson expressed his belief that the arrest had violated the Fourth Amendment to the United States Constitution, as well as Department policy[3] (E.21, 23) Lawson also alleged that Waiters and his deputy, Lieutenant Djakarta Hall, had been delinquent in failing to investigate the arrest:

Both [Waiters and Hall] had a duty and responsibility to recognized [sic] and identify that the fact [sic] and circumstances of the incident obviously indicates that both [Blue and Ducellier] were violating our resident student's Fourth Amendment Rights guaranteed under the United States Constitution Bill of Rights when they entered our resident student's rooms, uninvited, without consent, without a warrant and without any exigent circumstances. [Blue and Ducellier] repeatedly did this to many resident students prior to the both of them approaching and entering Room 405 and making the arrest.

Lawson showed the letter to Milburn, who advised him to send the letter to Travis rather than Waiters because Waiters

---

3. The relevant Police Department policy stipulates, "Searches of student rooms shall be subject to all of the normal procedures that protect citizens against unreasonable search and seizure."

had already praised the arrest. Lawson also sought the advice of Dorothy Holland, the University's Assistant Dean of Student Affairs and Judicial Coordinator. Holland testified that, during their meeting, Lawson became significantly upset when he began talking about the letter and his concerns about the Department:

> [W]hen he first started talking ... it was obvious that he was upset, he was concerned, he was angry. And at one point during the meeting he actually got upset, emotional.... I've known Lawson for a long time and I've never seen him get emotional that way....

Holland then told Lawson, "[I]f you don't trust the Chief of Police, you need to be having this conversation with Dr. Travis."

Lawson followed the advice of Milburn and Holland and delivered a copy of the letter in person to Travis on March 5, 2007. Lawson also attached a cover page in which he requested that Travis keep the letter and its contents confidential until he had an opportunity "to present suggested strategies for handling this situation to [University President Mickey Burnim] and [Travis].... I believe I have some good suggestions that are effective, proper and right."

Upon receiving the letter, Travis called Lawson to tell him that he would have to notify Waiters because the letter "was outside the chain of command." After discussing the letter with Waiters, Travis assigned Glen Isaac, the University's Labor Relations Manager, to investigate Lawson's allegations. Following his investigation, Isaac concluded that Ducellier and Blue had properly conducted the arrest; thus, Lawson's Fourth Amendment concerns were unfounded.

### C. The University's Discipline of Lawson

On March 13, 2007, the Department suspended Lawson on an emergency basis for (1) violating the Department's chain-of-command policy by submitting the letter to Travis and, (2) unrelated to the letter, his suspected involvement in the theft of University computers. Waiters conducted a suspension

hearing on March 15 and delivered a Notification of Charges to Lawson on May 16. With regard to Lawson's letter, the Department accused Lawson of violating seven different Department regulations. The Department also announced other unrelated charges against Lawson, none of which pertained to the alleged computer theft.

The Department's Administrative Hearing Board conducted a hearing regarding the charges. In its decision issued on January 18, 2008, the Hearing Board sustained four of the charges related to the letter, as well as a charge of "Unbecoming Conduct" concerning an unrelated incident. The Board's recommendation of Lawson's penalty for the letter included suspension without pay, demotion in rank, and a written reprimand. The Board also recommended a written reprimand and loss of two leave days for the unrelated "Unbecoming Conduct" charge.

On January 25, 2008, Waiters informed Lawson that he intended to increase the Board's recommended penalty and that he was giving Lawson the opportunity to respond in a hearing conducted by Waiters. Waiters wrote that his decision to increase the penalty was supported by his review of Lawson's past job performance, the Hearing Board's administrative record, and the investigation. Attached to this notification was a list of sixteen additional charges of misconduct, none of which had ever been brought to the attention of Lawson or the Hearing Board.

Three days after meeting with Lawson regarding the penalty increase, Waiters terminated Lawson's employment with the Department. Waiters wrote in his termination letter to Lawson:

Our meeting on February 11, 2008 was your opportunity to explain why these serious charges should not result in your termination. . . . [You did not] express any understanding or willingness to accept the chain of command in the police department. . . . Based on your inability to understand the seriousness of your refusal to follow the chain of command, and your statements that confirm you are unwilling to follow

the chain of command, you have made it clear that you truly believe you are not accountable to the police command structure.

### D. Lawson's Whistleblower Complaint

On September 4, 2007, Lawson sought relief from Waiters's decision to terminate his employment by filing a Whistleblower Complaint against the University Police Department with the Maryland Department of Budget and Management ("DBM") pursuant to Section 5–301 *et seq.* of the State Personnel and Pensions Article ("SPP") of the Maryland Annotated Code. Md.Code (1993, 2004 Repl.Vol.) (the "Whistleblower Act").

On January 8, 2008, the Office of Statewide Equal Employment Opportunity Coordinator ("OSEEOC") denied the complaint, and Lawson appealed to the Maryland Office of Administrative Hearings ("OAH"). Following a hearing, the OAH Administrative Law Judge affirmed the OSEEOC's denial on July 11, 2008. The ALJ ruled that Lawson's letter to Travis was not a protected disclosure because Lawson did not reasonably believe that the disclosed information contained "evidence of abuse of authority, gross mismanagement, gross waste of money, a substantial and specific danger to public health or safety, or a violation of law[.]" The ALJ found that Lawson not to be credible because his statements were motivated by a "crusade to make changes to the department himself." The ALJ dismissed Lawson's concerns related to the arrest on the grounds that "[Ducellier and Blue] credibly testified as to the events of that night, and [Waiters], a man with substantial experience in narcotics cases, also credibly testified that he felt nothing untoward went on that night." The ALJ did not reach the issue of whether the Department would have terminated Lawson notwithstanding the disclosure because he had already dismissed Lawson's complaint on the grounds that the letter was not a protected disclosure.

Lawson appealed to the Circuit Court for Prince George's County, which affirmed the OAH decision. Lawson then

sought review by the Court of Special Appeals, and this Court issued a writ of certiorari *sua sponte* before a decision by the intermediate appellate court. 417 Md. 500, 10 A.3d 1180 (2011).

## DISCUSSION

### I. Standard of Review

 Lawson asks only one question on appeal: Did the ALJ err in finding that Lawson did not make a protected disclosure under Maryland's Whistleblower Act? On review, we look "through the circuit court's ... decision[ ], although applying the same standard of review, and evaluate[ ] the decision of the agency." *People's Counsel for Baltimore County v. Loyola College in Md.*, 406 Md. 54, 66, 956 A.2d 166, 173 (2008) (citations omitted). Our role is thus "limited to determining if there is substantial evidence in the record as a whole to support the [ALJ's] findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law." *Board of Physician Quality Assur. v. Banks,* 354 Md. 59, 67–68, 729 A.2d 376, 380 (1999). In applying the substantial evidence test to the ALJ's factual findings, we ask "whether a reasoning mind reasonably could have reached the factual conclusion the agency reached." *Id.* at 68, 729 A.2d at 380. We treat the ALJ's decision as prima facie correct and presumed valid, as "it is the agency's province to resolve conflicting evidence and to draw inferences from that evidence." *Id.* at 68, 729 A.2d at 381 (citations omitted). With respect to an ALJ's conclusions of law, however, "we have often stated that a court reviews *de novo* for correctness.... [I]t is always within our prerogative to determine whether an agency's conclusions of law are correct, and to remedy them if wrong." *Schwartz v. Maryland Dep't of Natural Resources,* 385 Md. 534, 554, 870 A.2d 168, 180 (2005) (citations omitted).

### II. Analysis

 Maryland's Whistleblower Act, contained in Sections 5–301 through 5–313 of the State Personnel and Pensions

Article, prohibits reprisal against a State employee for making a protected disclosure.[4] SPP Section 5–305 defines a protected disclosure as "information that the employee reasonably believes evidences: (i) an abuse of authority, gross mismanagement, or gross waste of money; (ii) a substantial and specific danger to public health or safety; or (iii) a violation of law. . . ." *Id.* Additionally, the protected disclosure must "evidence an intent to raise an issue with a higher authority who is in a position to correct the alleged wrongdoing." *Dep't of Natural Resources v. Heller,* 391 Md. 148, 170, 892 A.2d 497, 510 (2006) (citations omitted). The employee must also show a causal connection between the disclosure and the adverse personnel action. *Id.* Once the employee meets these requirements, the burden shifts to the employer to show that it "would have taken the same personnel action in the absence of the protected disclosure." *Id.* at 171, 892 A.2d at 511.

 Here, the ALJ dismissed Lawson's appeal on the grounds that Lawson's letter was not a protected disclosure. Specifically, the ALJ concluded that Lawson did not have a "reasonable belief that evidenced abuse of authority, gross mismanagement, gross waste of money, a substantial and specific danger to public health or safety, or a violation of law." Having determined that Lawson did not meet the statutory criteria, the ALJ did not reach the issue of whether

---

4. For instance, in this case, Waiters predicated Lawson's termination on the latter's unwillingness to "accept the chain of command in the police department." Whistleblower protections would override this consideration because protected disclosures are often made to people outside the normal chain of command. For example, in *Huffman v. Office of Pers. Mgmt.,* 263 F.3d 1341 (Fed.Cir.2001), the Federal Circuit, using a hypothetical situation strikingly similar to the case at hand, explained that the purposes of the federal Whistleblower Protection Act are furthered by permitting disclosure to persons other than an immediate supervisor:

> An example is a law enforcement officer who is responsible for investigating crime by government employees who, feeling that the normal chain of command is unresponsive, reports wrongdoing outside of normal channels. This is clearly a disclosure protected by the Act, and the Act's core purposes are served by such a disclosure. *Id.* at 1354.

Lawson "was terminated because of his letter or whether he would have been terminated notwithstanding any disclosure he may have made." Thus, on appeal, we are concerned only with whether the ALJ erred in concluding that Lawson did not satisfy the "reasonable belief" requirement of the Whistle-blower Act.

Our Whistleblower statute is "patterned after the 'whistle-blower provisions' of the federal Civil Service Reform Act [of 1978.]" Hearings on H.B. 616 before the Senate Constitutional and Public Law Comm. (March 11, 1980) (statement of Delegate Joan B. Pitkin, sponsor of HB 616). The federal Civil Service Reform Act provided certain protections to federal employees who made disclosures that could often be "generally embarrassing to the government[.]" *Heller*, 391 Md. at 169, 892 A.2d at 509. Later, in 1989, Congress enacted the Whistleblower Protection Act ("WPA"), codified in 5 U.S.C. Section 2302(b)(8),[5] which provided federal employees with even greater protection against retaliation for protected disclosures. *Montgomery v. Eastern Corr. Inst.*, 377 Md. 615, 627, 835 A.2d 169, 177 (2003). Maryland's Whistleblower Act closely tracks this language, and we have thus advised Maryland courts to "look to the federal courts applying the Federal [WPA] because the purpose and language of the statutes are substantially similar." *Heller*, 391 Md. at 170, 892 A.2d at 510.

The Civil Service Reform Act and subsequent WPA were borne out of "Congressional concern over protecting taxpayers from illegality, waste and abuse[.]" H.R.Rep. No. 274, 100th

---

**5.** That section provides, in relevant part:

(b) Any employee who has authority to take, direct others to take, recommend, or approve any personnel action, shall not, with respect to such authority—

(8) take or fail to take, or threaten to take or fail to take, a personnel action with respect to any employee or applicant for employment because of—

(A) any disclosure of information by an employee or applicant which the employee or applicant reasonably believes evidences—

(i) a violation of any law, rule, or regulation, or

(ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety[.]

Cong., 1st Sess. 17 (1987). From the beginning, the Act had "broad bipartisan support" because the whistleblower protections contained therein were "essential if Government employees [were] to adequately serve the public." *Id.* at 18. Thus, whistleblowers are "encouraged" to report "incidences of illegal or wasteful activities[,]" and when doing so, "will be guaranteed confidentiality and protected against reprisals[.]" President Ronald Reagan, Public Papers of the Presidents of the United States, 1981, p. 359 (Government Printing Office 1982), reported in H.R.Rep. No. 274, *supra,* at 18. *See also* S.Rep. No. 413, 100th Cong., 2d Sess. 12–13 (1988) ("The [Governmental Affairs Committee] intends that disclosures be encouraged.").

■ In accordance with this clear legislative preference for disclosure, federal courts have broadly interpreted the statute in favor of protecting whistleblowers. *See, e.g., Reid v. MSPB,* 508 F.3d 674, 677 (Fed.Cir.2007) ("The language of the statute indicates Congress's intent to legislate in broad terms, and we conclude that, absent some exclusionary language, a cramped reading of the statute ... would be counter to that intent."). With regard to the "reasonable belief" requirement of the WPA, federal courts apply an objective test. *See Giove v. Dep't of Transp.,* 230 F.3d 1333, 1338 (Fed.Cir.2000) ("[T]he test for whether a belief is reasonable is an objective one."); *see also Lachance v. White,* 174 F.3d 1378, 1381 (Fed.Cir.1999) ("A purely subjective perspective of an employee is not sufficient even if shared by other employees."). Specifically, federal courts ask, "could a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee reasonably conclude that the actions of the government evidence [a violation of the WPA]?" *Lachance,* 174 F.3d at 1381. Following this federal approach, Maryland courts also apply an objective test, with the burden falling upon the employee to prove "that a reasonable person in his position would believe the disclosure evidence[d] a violation." *Montgomery,* 377 Md. at 641, 835 A.2d 169, 185 (2003) (quoting *Ramos v. Dep't of the Treasury,* 72 M.S.P.R. 235, 240 (1996)).

 Although an employee must prove that a reasonable person would believe the disclosure exposes a violation, the employee need not prove that a violation actually occurred. *See Kahn v. Dep't of Justice,* 618 F.3d 1306, 1312–1313 (Fed. Cir.2010) ("The petitioner need not prove an actual violation of law, rule, or regulation."). For example, in *Drake v. Agency for Int'l Dev.,* 543 F.3d 1377 (Fed.Cir.2008), the Federal Circuit Court of Appeals reversed an ALJ's finding that petitioner's disclosure, regarding alleged intoxication of other employees, was not protected, because the ALJ erroneously required petitioner to prove those employees were actually intoxicated:

> By requiring Mr. Drake to prove that the agency personnel were intoxicated, the AJ erroneously required Mr. Drake to prove that an actual violation occurred. This is in direct conflict with the standard set forth in *Lachance* . . . .
> The test is not whether Mr. Drake was able to prove intoxication, but rather could a disinterested observer with knowledge of the essential facts known to and readily ascertainable by Mr. Drake reasonably conclude that agency personnel were intoxicated and that a violation did occur. Applying the proper legal test, the undisputed findings of the ALJ lead to but one conclusion—Mr. Drake made a protected disclosure.

*Drake,* 543 F.3d at 1382 (some citations omitted). Federal courts have reasoned that requiring a violation of law, rule, or regulation to occur before the employee could make a protected disclosure "would place such whistleblowers in the position of either making a disclosure to avert the potential harm without statutory protection, or waiting until the waste or wrongdoing had occurred, and possibly incurring responsibility thereby." *Ward v. Dep't of the Army,* 67 M.S.P.R. 482, 488 (M.S.P.B.1995). Because such a requirement would interfere with the WPA's purpose of promoting disclosure, federal courts have declined to adopt it:

> We find that, rather than promoting the congressional intent that disclosures be encouraged, such an interpretation would have a serious 'chilling effect' on would-be whistle-

blowers whose disclosures could avert or prevent governmental wrongdoing.... [Accordingly,] we find that the disclosure of such potential violations may be protected where they evidence a reasonable belief of wrongdoing[.]

*Id.* (citation omitted).

When evaluating whether a disclosure satisfies the objective test, the critical evidence is the disclosure itself. For example, an examination of the disclosure may reveal that the employee's knowledge is based upon unsubstantiated rumors or that the employee lacked a firm belief that a violation had occurred. *See Huffman v. Office of Pers. Mgmt.,* 92 M.S.P.R. 429, 434–36 (2002) (although concluding that the employee had successfully alleged that he had a reasonable belief violations occurred, the court observed that statements such as "While I could be incorrect, I have a hazy recollection of a meeting" and "I have no substantiated knowledge of wrongdoing" weigh against such a finding). Or the allegations contained therein may be facially insufficient to support a finding of reasonable belief. *See Herman v. DOJ,* 193 F.3d 1375, 1380 (Fed.Cir.1999) (memorandum expressing prison psychologist's concern about the possible effect that copying his telephone logs may have on the confidentiality of the program was not a protected disclosure because he never disclosed that any confidential "counseling information" was copied.). When analyzing the disclosure, an ALJ should take into account the employee's experience to determine whether a reasonable person in the employee's position would view the disclosure as evidencing wrongdoing. *See Haley v. Dep't of Treasury,* 977 F.2d 553, 557 (Fed.Cir.1992) (governing statute granted broad discretion to agency officials; thus, the employee, an agency examiner for 13 years, could not have reasonably believed that the exercise of that discretion violated the statute).

Here, the ALJ found that Lawson did not have a reasonable belief because the ALJ believed Lawson's disclosure was motivated by "a crusade to make changes to the [BSU Police Department] himself" rather than for the purpose

of "alerting a higher authority to a pattern of wrongdoing[.]" While we generally defer to the ALJ's credibility assessments, *see Anderson v. Department of Pub. Safety & Correctional Servs.*, 330 Md. 187, 216, 623 A.2d 198, 212 (1993) (a reviewing court "should give appropriate deference to the opportunity of the examiner to observe the demeanor of the witnesses"), we recognize that these determinations are not without limits. Both the WPA and Maryland's Whistleblower Protection statute require only that the employee have a reasonable belief that he is reporting a violation, not that the employee possess a purely altruistic motive for the disclosure. This distinction was articulated in the legislative history of the federal Civil Service Reform Act, which indicated a congressional intent to overrule a prior, appellate decision in a whistleblower case that focused on the personal motive of an employee. *See, e.g., Horton v. Dep't of the Navy*, 66 F.3d 279 (1995) (describing legislative history). Specifically, the Senate Committee for Governmental Affairs described a change [6] to the WPA as follows:

In *Fiorillo v. Dep't of Justice*, 795 F.2d 1544, 1550 (Fed. Cir.1986) an employee's disclosures were not considered protected because the employee's "primary motivation" was not for the public good, but rather for the personal motives of the employee. The court reached this conclusion despite the lack of any indication in CSRA that an employee's motives are supposed to be considered in determining whether a disclosure is protected.

The Committee intends that disclosures be encouraged. The OSC, the Board and the courts should not erect barri-

---

**6.** This change involved replacing "a disclosure" with "any disclosure," such that statute now reads: "[A supervisor may not] take ... a personnel action with respect to any employee or applicant for employment because of—(A) *any* disclosure of information by an employee or applicant which the employee or applicant reasonably believes evidences [a violation.]" 5 U.S.C. Section 2302(b)(8) (emphasis added). Congress deemed the change necessary "to stress that *any* disclosure is protected (if it meets the requisite reasonable belief test and is not required to be kept confidential)." S.Rep. No. 413, 100th Cong., 2d Sess. 13 (1988) (emphasis in original).

ers to disclosures which will limit the necessary flow of information from employees who have knowledge of government wrongdoing.

S.Rep. No. 413, 100th Cong., 2d Sess. 12–13 (1988).

As a result of this legislative history, the same appellate court later held that an ALJ erroneously considered an employee's motives when denying the employee whistleblower relief. In *Horton*, 66 F.3d 279, an employee alleged that his civilian service had been terminated because of a letter he had written to the head of his department in which he disclosed that, among other things, "there was inadequate supervision of employees, chronic tardiness, [and] falsification of time cards[.]" *Id.* at 281. The ALJ found Horton not to be credible because his "motivation in writing the letter was primarily an attempt to shift blame, create discord, and evade imminent disciplinary action." *Id.* at 282 (quotation marks omitted). The Federal Circuit, however, refused to accept the ALJ's credibility determination because "it was intertwined with the finding that Mr. Horton's motivation was personal and vindictive." *Id.* at 283. The Court acknowledged that credibility is "indeed relevant in determining [an employee's] reasonable belief[,]" but that consideration of an employee's motives for making the disclosure is improper in light of the Congressional response to *Fiorillo*. *Id.* The ALJ had improperly conflated these two concepts such that reversal of "[his] reliance on Mr. Horton's motivation, [meant that] the accompanying credibility determination lost its support." *Id.* at 283. Accordingly, the Court only considered the letter on its face, and ultimately held that it was a protected disclosure. *Id.*

A review of the ALJ's decision in this case presents the same problem addressed in *Horton*. Here, instead of adhering to the objective test articulated in *Montgomery*, the ALJ attacked Lawson's motive for making the disclosure. Specifically, the ALJ found Lawson's statements were not protected disclosures because they were "indicative of an overall pattern on the part of [Lawson] that he is not making his disclosures with the purpose of alerting a higher authority

to a pattern of wrongdoing in the BSU Police Department, but rather he is on a crusade to make changes to the department himself." According to the ALJ, this "crusade" was evident from Lawson's repeated discussions of the potential "fallout" and "embarrassment" that might result if the public were to learn of the violations, and Lawson's "suggestions for remedying the problems[.]" The ALJ concluded that Lawson's "pressing concern, throughout his letter, with potential civil liabilities [was] inconsistent with the nature of the Whistleblower statute as a statute to permit disclosures of illegal activity." It is clear to us that this preoccupation with Lawson's motives improperly shaped the ALJ's credibility determination: "I note an overall pattern in [Lawson's] behavior that speaks to a personal quest to improve aspects of the police department he does not like, and this belies [his] credibility." As in *Horton,* the ALJ's use of an improper standard has undermined his credibility finding. Because we agree with *Horton* that a motivation to make changes in the department is not a ground for denying whistleblower protections, we hold that the ALJ erred.[7]

In its brief, Bowie State University makes a passing argument that, even if Lawson made one protected disclosure, his letter contained other allegations that would clearly not be protected disclosures.[8] The ALJ, however, did not distinguish between Lawson's allegations when concluding that they were

---

**7.** We observe that the record indicates that Sergeant Blue's credibility had not always been above suspicion. At Lawson's earlier disciplinary hearing, Blue testified that Lawson had referred to him as the "departmental snitch" and that Blue found the comment "offensive and polarizing." The Department's Administrative Hearing Board found Blue's testimony "to be less than credible" because it conflicted with other evidence, leading the Board to "disregard[ ] his claim of offense over the statements made by Sgt. Lawson." As a result, the Board found Lawson not guilty of the related disciplinary charge.

**8.** Specifically, the University asserts that Lawson's allegations concerning "hiring and promotion practices, the ceremonial award of badges to officers awaiting certification, and an officer driving on an expired license" are not protected disclosures under the Whistleblower statute because they concern collective bargaining or employee grievance matters.

part of his "crusade," and thus applied the incorrect legal standard to each of Lawson's allegations. Moreover, it is not at all clear that a communication containing a protected disclosure will always lose its protected status simply because it also includes some unprotected material. *See Chambers v. DOI*, 602 F.3d 1370, 1379–1380 (Fed.Cir.2010) (referring to one or more conversations with a Washington Post reporter and stating: "[w]e do not find it necessary for present purposes to examine all of Chambers' statements to the Washington Post reporter as we agree with Chairman McPhie that Chambers' first statement . . . was protected under the WPA as evidencing a substantial and specific danger to public health or safety."). *Huffman v. Office of Pers. Mgmt.*, 263 F.3d 1341, 1351 (Fed.Cir.2001) (remanding for determination of whether certain statements made by employee were protected, even though employee made other disclosures that were not protected).

In sum, the ALJ must apply the appropriate, objective standard to determine the reasonableness of Lawson's belief, and then, if necessary, proceed to a consideration of the remaining requirements under the Whistleblower statute. We reverse the Circuit Court's affirmance of the ALJ's decision, and remand to that court with instructions to vacate the ALJ decision and remand for further proceedings consistent with this opinion.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO VACATE THE DECISION OF THE ADMINISTRATIVE LAW JUDGE AND REMAND THE CASE TO THE MARYLAND OFFICE OF ADMINISTRATIVE HEARINGS FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY BOWIE STATE UNIVERSITY.**