**Mohammed YUNUS, Petitioner,**

v.

**DEPARTMENT OF VETERANS AFFAIRS, Respondent.**

No. 00–3051.

United States Court of Appeals, Federal Circuit.

March 22, 2001.

Paul A. Donnelly, Donnelly & Gross, P.A., of Gainesville, FL, argued for petitioner. With him on the brief was Laura A. Gross.

Martin F. Hockey, Jr., Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for respondent. With him on the brief were David M. Cohen, Director; and Kirk T. Manhardt, Assistant Director.

Before CLEVENGER, Circuit Judge, SMITH, Senior Circuit Judge,\* and BRYSON, Circuit Judge.

BRYSON, Circuit Judge.

Dr. Mohammed Yunus, who was formerly employed as a physician with the Department of Veterans Affairs (DVA), appeals from an order of the Merit Systems Protection Board holding that the DVA did not violate the Whistleblower Protection Act when it discharged Dr. Yunus from his position with the agency. We affirm.

I

At the time of his discharge, Dr. Yunus was the head of radiology at the DVA's Daytona Beach Outpatient Clinic in Daytona Beach, Florida. In that capacity, he supervised two diagnostic radiologic technologists.

Dr. Yunus had a difficult working relationship with Don Clardy, one of the two diagnostic radiologic technologists. Dr. Yunus and Mr. Clardy each filed a number of complaints against the other during the time they worked together. In 1994, Dr. Yunus discovered that Mr. Clardy had not been certified by the American Registry of Radiology Technologists (ARRT). The applicable DVA regulations provide that a diagnostic radiologic technologist must be

---

\* Senior Judge Smith heard oral argument in this case ·but, due to illness, did not participate in the decision. The case was decided by the remaining judges in accordance with Fed. Cir. Rule 47.11.

certified by the ARRT unless the technologist was permanently employed by the DVA on June 21, 1986, and his or her competence was affirmed in writing by a VA licensed physician by January 1, 1987. Dr. Yunus reported Mr. Clardy's lack of certification to a human resources officer at the DVA and to Dr. Sam Hyde, the chief medical officer at the Daytona Beach Outpatient Clinic. His report, however, did not address whether Mr. Clardy's competence had been affirmed in writing as required by the applicable regulation. Dr. Yunus repeated his concerns regarding Mr. Clardy's qualifications to serve as a diagnostic radiologic technologist when he reported other instances of alleged misconduct by Mr. Clardy between 1995 and 1998.

The events leading to Dr. Yunus's removal began in December 1997 when Dr. Yunus and Mr. Clardy again clashed. Dr. Yunus reported that Mr. Clardy had failed to follow instructions during fluoroscopy procedures on December 5, 1997 (involving patient Vernon Parker) and December 23, 1997 (involving patient Robert Taylor). As a result of Dr. Yunus's allegations, Mr. Clardy was issued a notice proposing a 14 day suspension. After Mr. Clardy's union representative requested the evidence file, Dr. Hyde determined that the incidents should be investigated further and instructed Mr. Alonzo Poteet, the Daytona Clinic coordinator, to direct the investigation. Mr. Poteet interviewed Mr. Clardy and the two patients, Mr. Parker and Mr. Taylor. The two patients contradicted Dr. Yunus's version of the events and attested that Mr. Clardy had followed Dr. Yunus's instructions during the procedures. In light of the patients' account of the events, a decision was made not to pursue the suspension action against Mr. Clardy.

Mr. Poteet met with Dr. Yunus on April 10, 1998, to explain the agency's decision regarding Mr. Clardy's suspension and to request that Dr. Yunus withdraw his complaint. Dr. Yunus's conduct during that meeting was cited in the notice of proposed discharge later issued to Dr. Yunus:

> At this point, you became highly agitated and began jabbing your fingers within inches of [Mr. Poteet's] face. Your voice escalated and you told him to do his job and you would do yours. You continued your aggressive behavior and refused to withdraw your complaint. Mr. Poteet felt you were on the verge of losing complete control and he feared you might physically batter him. Mr. Poteet described your behavior as disrespectful, arrogant, excessive, abusive, and physically intimidating.

Dr. Yunus also met with Dr. Hyde on the same day. According to Dr. Hyde's account of that meeting, as reported in the notice of proposed discharge, Dr. Yunus "displayed the same aggressive and intimidating demeanor when approached regarding the 'Clardy' incident." However, no action was taken against Dr. Yunus until later when the conflict between Dr. Yunus and Mr. Clardy escalated.

On April 22, 1998, Mr. Clardy reported that Dr. Yunus had threatened him with physical harm. Because of the seriousness of the charge, the clinic's security office was asked to investigate Mr. Clardy's allegations. Captain Milt Gordon interviewed both Mr. Clardy and Dr. Yunus. Dr. Yunus admitted that he had slammed the door of his office on Mr. Clardy on two separate occasions. Captain Gordon then re-interviewed Mr. Parker and Mr. Taylor, the two patients who had been the subjects of the fluoroscopy procedures in December 1997. Mr. Taylor reported seeing Dr. Yunus "put [his] hands on Mr. Clardy and physically push him out of a room on April 22, 1998." Mr. Taylor and Mr. Parker also confirmed that during the prior incidents of December 5 and December 23, "Mr. Clardy had attempted to follow [Dr. Yunus's] instructions but was berated by [him]."

Upon receipt of Captain Gordon's report, Dr. Hyde issued a notice of proposed discharge to Dr. Yunus on May 15, 1998, citing grounds of "disrespectful conduct, conduct unbecoming of a Federal employee, use of insulting abusive language to other personnel, making defamatory statements about other VA personnel and fabricating evidence in order to secure disciplinary action against a subordinate." Dr. Hyde also charged Dr. Yunus with assault against Mr. Poteet and battery against Mr. Clardy. Dr. Hyde's supervisor, Dr. Michael Good, heard Dr. Yunus's oral reply to the notice of proposed discharge.

On July 8, 1998, the deciding official, Dr. Elwood Headley, affirmed the discharge, sustaining all charges except those of battery and of fabricating evidence. Dr. Headley, however, noted that "[a]lthough evidence may not have been completely fabricated to obtain disciplinary action against a subordinate, your blatant distortion of the factual record has undermined your credibility to the point that the agency would not be able to confidently rely on you to continue in your supervisory role." He further stated that because the evidence as to battery was disputed, the battery charge was "not sustained even though the factual record elicited probably would have supported criminal charges of battery."

After exhausting his administrative remedies before the Office of Special Counsel (OSC), Dr. Yunus filed an individual right of action (IRA) appeal with the Merit Systems Protection Board alleging that the DVA had violated the Whistleblower Protection Act (WPA). He invoked that avenue of relief, rather than appealing directly from his removal, because the Merit Systems Protection Board lacks jurisdiction to review the removal of an employee in Dr. Yunus's position. *See* 5 U.S.C. § 7511(b)(10); 38 U.S.C. § 7425(a)(8) (providing that a physician in the Veterans Health Administration appointed pursuant to 38 U.S.C. § 7401(1) is not subject to subchapter V of chapter 75 of title 5, which provides for appeals to the Merit Systems Protection Board from adverse agency actions); *Khan v. United States*, 201 F.3d 1375, 1380–81 (Fed.Cir.2000).

The administrative judge assigned to Dr. Yunus's IRA appeal found that Dr. Yunus had satisfied the jurisdictional criteria for the WPA and had established by a preponderance of the evidence that his protected disclosures had contributed to his discharge. The administrative judge also concluded that the DVA had failed to show by clear and convincing evidence that it would have proposed and effected Dr. Yunus's discharge absent his protected disclosures.

The DVA filed a petition for review asking the full Board to review the initial decision. The DVA cited two grounds in its petition for review: (1) that Dr. Yunus had not made any protected disclosures within the meaning of 5 U.S.C. § 2302(b)(8); and (2) that the DVA had shown by clear and convincing evidence that it would have proposed and effected the removal absent any protected disclosure.

The Board granted review and reversed the initial decision based on the second ground raised by the DVA in its petition. The Board stated:

> Given our finding, explained below, that the agency proved by clear and convincing evidence that it would have taken the action despite any alleged whistleblowing activity, we need not, and do not, reach the issue (raised on petition for review) of whether the administrative judge was correct in finding that the appellant made protected disclosures.

Thus, the Board did not expressly address the question whether Dr. Yunus had made any protected disclosures as defined by 5 U.S.C. § 2302(b)(8).

## II

■ At oral argument and in post-argument submissions, the parties addressed the question whether the merits of Dr. Yunus's appeal are properly before the court in light of the recent decision in *Schmittling v. Department of the Army,* 219 F.3d 1332 (Fed.Cir.2000). In that case, Mr. Schmittling filed an IRA appeal based on a personnel action taken against another person. Because the action in question had an effect on Mr. Schmittling, he contended that the action gave the Board jurisdiction˚ over his IRA appeal. The Board elected not to address that jurisdictional issue, but simply assumed that it had jurisdiction over the appeal and addressed the merits. On the merits, the Board concluded that Mr. Schmittling was not entitled to relief because the agency had proved by clear and convincing evidence that it would have taken the action in question even in the absence of Mr. Schmittling's alleged acts of whistleblowing.

On Mr. Schmittling's appeal, this court disapproved the Board's decision to skip over the jurisdictional question in order to reach the merits. The court explained that the Board was without authority to address the merits of a dispute unless Congress had granted it jurisdiction to do so. The court therefore ruled that it was improper for the Board simply to bypass the question whether it had jurisdiction in favor of deciding the merits of the case, rather than first resolving the jurisdictional issue that had been presented to it. For that reason, the court vacated the Board's ruling and directed the Board to address the question of its own jurisdiction before reaching the merits of Mr. Schmittling's claim. *See Schmittling,* 219 F.3d at 1336–37.

■ In this case, the Board did not reach the issue of whether Dr. Yunus had made any protected disclosures. Instead, the Board determined, as in *Schmittling,* that Dr. Yunus was not entitled to relief on the merits because the agency had established by clear and convincing evidence that he would have been discharged even absent any protected disclosures on his part. The procedural posture of this case is therefore similar to that in *Schmittling.* We do not believe that *Schmittling* requires us to remand this case for the Board to decide the jurisdictional issue, however, because we do not interpret *Schmittling* to require us to remand a case to the Board whenever the Board bypasses the question of its jurisdiction in order to decide the case on a nonjurisdictional ground. Where it is clear to us that the Board has jurisdiction over a case, it would be pointless to remand the case to the Board for the Board to make its own jurisdictional determination. The error that this court identified in *Schmittling*—the Board's conclusion that it could decide a case on the merits even if it lacked jurisdiction—is not presented in a case in which it is clear that the Board has jurisdiction, even if the. Board did not address the jurisdictional issue. *See Briley v. Nat'l Archives & Records Admin.,* 236 F.3d 1373, 1380 (Fed.Cir.2001).

■ This court has held that the Board has jurisdiction over an IRA appeal if the appellant has exhausted his administrative remedies before the OSC and makes "nonfrivolous allegations" that (1) he engaged in whistleblowing activity by making a protected disclosure under 5 U.S.C. § 2302(b)(8), and (2) the disclosure was a contributing factor in the agency's decision to take or fail to take a personnel action as defined by 5 U.S.C. § 2302(a). *See Briley,* 236 F.3d at 1378; *Meuwissen v. Dep't of Interior,* 234 F.3d 9, 12 (Fed.Cir.2000); *Schmittling,* 219 F.3d at 1336; *Willis v. Dep't of Agric.,* 141 F.3d 1139, 1142 (Fed. Cir.1998); *see generally Spruill v. Merit*

*Sys. Prot. Bd.,* 978 F.2d 679, 686–89 (Fed. Cir.1992).[1]

■ Dr. Yunus plainly satisfied these jurisdictional requirements. His discharge was clearly a "personnel action" as defined in 5 U.S.C. § 2302(a)(2)(A), and it was undisputed that he exhausted his remedies before the OSC. As to the remaining element, Dr. Yunus alleged that he made a disclosure of information that he reasonably believed evidenced a violation of a law, rule, or regulation, as required under 5 U.S.C. § 2302(b)(8), which was a contributing factor in his discharge. His claim was therefore facially sufficient to satisfy the jurisdictional requirements. Moreover, his factual allegations as to the jurisdictional requirements were not frivolous; indeed, the administrative judge found that Dr. Yunus met his burden of showing that his disclosures were protected and were a contributing factor in the decision to discharge him. Under these circumstances, because it is clear that the Board had jurisdiction over Dr. Yunus's appeal, *Schmittling* does not require us to remand the case to the Board for it to consider the jurisdictional question. We therefore conclude that the Board did not commit legal error in deciding the case based on the DVA's affirmative defense rather than first deciding whether Dr. Yunus had proved by a preponderance of the evidence that his disclosures were protected under the WPA.

III

■ In rejecting Dr. Yunus's WPA claim on the merits, the Board found that the DVA had shown by clear and convincing evidence that it would have removed Dr. Yunus even in the absence of any protected disclosures. The Board concluded that the evidence the agency had before it was strong, that the agency's motivation to retaliate was slight, at best, and that the evidence did not show that the agency treated Dr. Yunus differently than it treats similarly situated employees who are not whistleblowers. *See Social Sec. Admin. v. Carr,* 78 M.S.P.R. 313, 334–35 (1998) (identifying factors to be considered in whistleblowing cases). Those findings are supported by substantial evidence.

■ In weighing the agency's assertion that it would have removed Dr. Yunus without regard to his disclosures, the Board properly assessed the evidence as it stood at the time of the removal action. *See Carr,* 78 M.S.P.R. at 334–35. That is because the action taken by the agency officials must be weighed in light of what they knew at the time they acted; thus, later developments cannot be used either to support or undercut the validity of the action taken. At the time of Dr. Yunus's removal action, the deciding official, Dr. Headley, had before him Captain Gordon's report detailing Dr. Yunus's confrontations with Mr. Poteet and Mr. Hyde on April 10,

1. We recognize that the Board has taken a different approach to this jurisdictional issue from the one recited in the text. Under the Board's approach, an IRA appellant must prove the "disclosure," "exhaustion" and "personnel action" elements by a preponderance of the evidence before the Board will conclude that it has jurisdiction. *See Anderson v. Small Bus. Admin.,* 78 M.S.P.R. 518, 520 n. * (1998); *Geyer v. Dep't of Justice,* 63 M.S.P.R. 13, 16–17 (1994). Some of this court's cases have echoed the Board's approach, although without noting that the Board's approach conflicts with the rule adopted in *Spruill* and the other cases cited in the text. *See Herman v. Dep't of Justice,* 193 F.3d 1375, 1378 (Fed.Cir.1999); *King v. Dep't*

*of Health & Human Servs.,* 133 F.3d 1450, 1452 (Fed.Cir.1998); *Serrao v. Merit Sys. Prot. Bd.,* 95 F.3d 1569, 1574 (Fed.Cir.1996). To the extent that the characterization in those cases of the test for Board jurisdiction over IRA appeals conflicts with the test set forth in *Spruill* (and reaffirmed in the later cases cited in the text), we follow the authority of the earlier decision in *Spruill,* as this court's precedent requires us to do. *See Newell Cos. v. Kenney Mfg. Co.,* 864 F.2d 757, 765 (Fed.Cir. 1988) ("Where there is a direct conflict [between decisions of this court], the precedential decision is the first.").

1998, his violent encounter with Mr. Clardy on April 22, 1998, and an account of the prior incidents in December 1997. That report also included Dr. Yunus's admission that on two prior occasions he had forcibly shut his door on Mr. Clardy. Captain Gordon's report was supported by accompanying interviews, signed statements, and affidavits from the individuals concerned. It is reasonable for an agency to rely on such evidence. *See Kewley v. Dep't of Health & Human Servs.*, 153 F.3d 1357, 1364 (Fed.Cir.1998) (hearsay evidence may be used in Board proceedings "if, to a reasonable mind, the circumstances are such as to lend it credence"). Later-developed evidence that was not before Dr. Headley, such as evidence suggesting Mr. Poteet's lack of credibility, does not undercut the reasonableness of the agency's removal action at the time.

The Board's determination that the agency did not have a strong motivation to retaliate against Dr. Yunus is also supported by substantial evidence. The only possible improper motivation identified by Dr. Yunus was Dr. Hyde's alleged frustration with the on-going dispute between Dr. Yunus and Mr. Clardy and his alleged fear of Mr. Clardy's labor union, which Dr. Yunus contends was responsible for Dr. Hyde's decision to take Mr. Clardy's side in the dispute between the two of them. Other than Dr. Yunus's assertion, however, there was little evidence to support that theory of improper motivation. Dr. Hyde testified that Mr. Clardy's union "would pursue issues, unless every 'i' was dotted and 't' was crossed," and that "Mr. Clardy, when he had charges brought against him pursued each avenue available through the union master agreement." That testimony hardly establishes union intimidation of the agency managers, as Dr. Yunus contends. Moreover, neither Dr. Yunus nor the administrative judge assigned any retaliatory motive to Dr. Headley, Dr. Good, Mr. Poteet, or Captain Gordon. In addition, none of the participating officials (Dr. Hyde, Dr. Good, or Dr. Headley) was the subject of the protected disclosures by Dr. Yunus. The Board's conclusion that the agency's motivation to retaliate was slight at best is thus fully supported by the record.

Finally, there was no evidence that the agency treated Dr. Yunus differently than it treated similarly situated employees who were not whistleblowers. Dr. Yunus argues that Mr. Clardy was treated differently. The evidence available to the agency, however, did not indicate a similar level of culpability on the part of both individuals. Moreover, Dr. Yunus and Mr. Clardy were not similarly situated because Dr. Yunus, unlike Mr. Clardy, was a physician and supervisor in a position of trust and responsibility. *See Carr v. Social Sec. Admin.*, 185 F.3d 1318, 1327 (Fed.Cir.1999).

Based on the Board's findings, which we hold are supported by substantial evidence, we sustain the Board's conclusion that the DVA did not violate the WPA when it removed Dr. Yunus from his position in the Veterans Health Administration.

*AFFIRMED.*