# UNITED STATES OF AMERICA
# MERIT SYSTEMS PROTECTION BOARD

BETTY WILLIAMS NORWOOD,
           Appellant,

      v.

SMALL BUSINESS
   ADMINISTRATION,
           Agency.

DOCKET NUMBER
DC-1221-13-0830-W-1

DATE: February 15, 2023

# THIS ORDER IS NONPRECEDENTIAL[1]

James A. Westbrooks, Fort Washington, Maryland, for the appellant.

Nathania Bates, Washington, D.C., for the agency.

## BEFORE

Cathy A. Harris, Vice Chairman
Raymond A. Limon, Member
Tristan L. Leavitt, Member

## REMAND ORDER

¶1      The appellant has filed a petition for review of the initial decision, which denied her request for corrective action under the Whistleblower Protection Act

---

[1] A nonprecedential order is one that the Board has determined does not add significantly to the body of MSPB case law. Parties may cite nonprecedential orders, but such orders have no precedential value; the Board and administrative judges are not required to follow or distinguish them in any future decisions. In contrast, a precedential decision issued as an Opinion and Order has been identified by the Board as significantly contributing to the Board's case law. *See* 5 C.F.R. § 1201.117(c).

(WPA).[2] For the reasons set forth below, we GRANT the petition for review. We VACATE the administrative judge's findings that the appellant exhausted only one disclosure and that it was not protected or a contributing factor in the agency's decision to take a personnel action against her, and the administrative judge's alternate finding that the agency proved by clear and convincing evidence that it would have taken that action absent the appellant's protected disclosure. We REMAND the case to the regional office for further adjudication in accordance with this Remand Order.

## BACKGROUND

¶2    The appellant was employed as an Audit Manager in the U.S. Small Business Administration (SBA) Office of Inspector General (OIG). Sometime in or after October 2010, the appellant developed concerns about a March 2010 audit report that had been the subject of testimony to Congress and which she believed contained omissions and several inaccuracies.[3] Initial Appeal File (IAF), Tab 24 at 28-29. The appellant alleges having disclosed this information to a manager in the Credit Programs Group (CPG), the Assistant Inspector General for Auditing (AIGA), and the Deputy Inspector General who responded with "we will reissue the report." *Id*. at 29. However, the manager, after being promoted in early 2011 to Director of the CPG, decided not to reissue the report. *Id*.

¶3    The appellant subsequently expressed concerns to the CPG Director about the sufficiency of evidence in a 2012 audit report[4] and her beliefs about the 2010

---

[2] The WPA was amended by the Whistleblower Protection Enhancement Act of 2012, Pub. L. No. 112-199, 126 Stat. 1465, which took effect on December 27, 2012.

[3] SBA OIG Audit Report No. 10-10, *Audit of Premier Certified Lenders in the Section 504 Loan Program*.

[4] The 2012 report, referenced by the appellant as the "High-Risk Lenders report," appears most likely to have been SBA OIG Audit Report No. 12-20, *Addressing Performance Problems of High-Risk Lenders Remains a Challenge for the Small Business Administration*. *See* IAF, Tab 24 at 25-26.

report. *Id.* at 7, 25-26. The appellant shared her concerns the next day with the AIGA and met with the Inspector General on March 27, 2012, to discuss her concerns and to request reassignment under a different first-line supervisor. *Id.* at 25-26. She followed up with a letter to the Inspector General, recounting her history of disclosures regarding both audit reports, disclosing that the CPG Director had bragged that the Deputy Inspector General had preselected her as Director and moved the duty station in the Director vacancy listing from agency headquarters to a field office location purely for the Director's benefit, and alleging that the CPG Director approved a nearly $1 million payment to a contractor to review loans, only to later have the work entirely redone by her own staff. *Id.* at 25-30.

¶4       In July 2012, the appellant met with an Equal Employment Opportunity (EEO) counselor to allege that the CPG Director had subjected her to harassment since September 2011 because of her race, sex, and age. IAF, Tab 10 at 67-73. Following an unsuccessful mediation, *id.* at 72, the appellant filed a formal EEO complaint naming the CPG Director, the AIGA, the since-retired Deputy Inspector General, and the Inspector General. IAF, Tab 11 at 64-82.

¶5       Meanwhile, the appellant sent an email to officials in the U.S. Congress, the Office of Government Ethics, and the Council of Inspectors General on Integrity and Efficiency (CIGIE), repeating the disclosures that favoritism towards the CPG Director had resulted in her change of duty station to a field office, the decision not to retract the deficient March 2010 audit report, and the waste of nearly $1 million. IAF, Tab 1 at 25-28. She further alleged that because of the favoritism, the field office where the CPG Director worked had been allowed to remain open when the agency's three other field offices were closed in October 2011. *Id.* at 26. She raised similar allegations in a separate email to the President. IAF, Tab 10 at 35-38.

¶6       By letter dated September 25, 2012, the CIGIE Integrity Committee informed the appellant that it lacked jurisdiction to address the allegations raised

in her email because they did not appear to involve the actions of either the Inspector General herself, an individual who reported directly to the Inspector General, or a person whose position had been designated by the Inspector General. IAF, Tab 1 at 33. The appellant responded by letter in November 2012 asserting that the Inspector General, the Deputy Inspector General, the Counsel to the Inspector General, and the AIGA were all implicated in the actions she had described. *Id*. at 34-35, 40-41. She also alleged, *inter alia*, that the Inspector General was responsible for systemic race and age discrimination, *id*. at 36-38, and that both the Inspector General and the AIGA had placed sensitive loan information at risk, *id*. at 39.

¶7        Responding by letter to the CIGIE Integrity Committee a month later, the appellant forwarded a copy of an email exchange between the CPG Director and the AIGA that had been copied to several other staff members. *Id*. at 20. The email conveyed the Director's message that she was working in a back office in headquarters that day, and the AIGA responded with a symbol denoting a wink (";-)"). *Id*. at 21. The appellant reported that several staff members had told her that the AIGA's message was inappropriate and made them feel uncomfortable. *Id*. at 20. After the CIGIE Integrity Committee informed the appellant that the matter fell outside its jurisdiction, *id*. at 23, she reported the AIGA's email to members of Congress, *id*. at 24.

¶8        During a December 2012 meeting between the CPG Director and the appellant to discuss the appellant's performance during the prior fiscal year, the CPG Director told the appellant that she had received negative feedback from other employees about the appellant's communication and collaboration. On January 2, 2013, the appellant asked the CPG Director by email to identify the source of the negative feedback. The CPG Director responded with the names of two offices within SBA. IAF, Tab 10 at 84-85.

¶9        Five days later the appellant sent an email to several officials in the offices identified by the CPG Director, with copies to the AIGA and the CPG Director, in

which she apologized "for any dialogue (verbal or written) that I exchanged or actions that I took during FY 2012 that resulted in your perception of me as negative or obstructionist." *Id*. at 94. She asked for their forgiveness as well as "any suggestions that will make for a more collaborative working relationship in FY 2013 and beyond." *Id*. Having received no response, the appellant sent another email a week later in which she also requested "details about the specific dialogue and actions that I took in FY 2012 that left you feeling like you did not want to work with me." *Id*. at 104-05. The day after the appellant's second email, the AIGA informed her that her emails might raise an issue of auditor independence and/or objectivity. *Id*. at 107. He stated that he was seeking clarification from the Auditing Standards Group at the Government Accountability Office (GAO) regarding those issues, and he directed her not to send any further emails on the matter. *Id*. at 107.

¶10 The AIGA presented his concerns regarding the appellant's independence and objectivity to GAO. *Id*. at 113-14. In a telephone conversation that was later confirmed in writing, an official from the GAO Auditing Standards Group advised the AIGA that, while the appellant's emails were inappropriate, they did not violate the Government Auditing Standard for Independence for either current or past auditing work. *Id*. at 125. However, the GAO official advised the AIGA that the appellant should not be assigned future work with the offices that received her emails because management in those offices could perceive the emails as threatening or intimidating. *Id*. On February 4, 2013, the AIGA informed the appellant that going forward, she was not to conduct any audit work involving the Office of Credit Access or its subordinate organizations. IAF, Tab 1 at 53.

¶11 In the meantime, in January 2013, the appellant had forwarded her correspondence with CIGIE to the congressional committees with jurisdiction over the inspector general system. *Id.* at 24. The appellant also filed a complaint with the Office of Special Counsel (OSC) on February 13, 2013, in which she

6

alleged retaliation for whistleblowing, citing the AIGA's decision to restrict her ability to perform certain audit work as an act of retaliation.  IAF, Tab 11 at 44-59.

¶12    In April 2013, OSC informed the appellant of its initial determination to close its file regarding her complaint.  IAF, Tab 1 at 89.  In a written response to OSC's determination that she had not provided enough specific information regarding her disclosures, the appellant argued that her November 2012 letter to the CIGIE Integrity Committee and her January 2013 letters to members of Congress constituted protected activity under 5 U.S.C. § 2302(b)(9).  *Id*. at 14.  She also alleged that the AIGA's actions restricting her audit responsibilities violated 5 U.S.C. § 2302(b)(12).  *Id*. at 16.  By letter dated May 24, 2013, OSC informed the appellant that her response had not provided a sufficient basis to alter its initial determination to close its file, and also informed her of her right to seek corrective action from the Board.  IAF, Tab 11 at 60-63.

¶13    The appellant remained in her position and continued performing other audit work.  IAF, Tab 13 at 20.  In June 2013, following the departure of another Audit Manager, the AIGA reassigned the appellant to serve in the same position in an audit group for which she was not prevented from performing any audit work within the group's jurisdiction.  *Id*.; IAF, Tab 11 at 99.

¶14    The appellant filed this individual right of action (IRA) appeal on July 7, 2013.  IAF, Tab 1.  She initially requested a hearing, *id*. at 2, but later withdrew that request, IAF, Tab 26, Initial Decision (ID) at 1.  The administrative judge issued an initial decision based on the written record.

¶15    In her initial decision, the administrative judge found that the appellant established having exhausted her administrative remedies as to only one of her alleged disclosures, i.e., that OIG allowed an erroneous audit report to be published on its website, but that she failed to show that she had provided OSC with sufficiently clear and precise information about her remaining disclosures to establish exhaustion.  ID at 11.  The administrative judge further found that the

appellant nonfrivolously alleged that her disclosure was protected and that it was a contributing factor in the AIGA's decision to restrict the scope of the audit work the appellant could perform beginning in February 2013, and that therefore the appellant had established Board jurisdiction over her IRA appeal. ID at 10-12. However, on the merits of the appeal, the administrative judge found that the appellant failed to prove by preponderant evidence that her audit report disclosure was protected or that it was a contributing factor in the personnel action at issue. ID at 13-15. The administrative judge further found that the agency established by clear and convincing evidence that it would have taken the same action absent the appellant's disclosure. ID at 15-17. Accordingly, the administrative judge denied the appellant's request for corrective action.[5] ID at 17.

¶16    The appellant filed a timely petition for review of the initial decision, in which she challenges several of the administrative judge's factual findings. Petition for Review (PFR) File, Tab 1 at 5-11. She argues that the administrative judge failed to properly consider additional disclosures, *id.* at 11-14, and she challenges the administrative judge's findings that she failed to prove that her disclosure was protected or that it was a contributing factor in the personnel action, *id.* at 14-15. Finally, the appellant challenges the administrative judge's finding that the agency proved by clear and convincing evidence that it would have taken the personnel action absent her disclosure. *Id.* at 15-17. The agency has responded in opposition to the petition for review, PFR File, Tab 3, and the appellant has filed a reply, PFR File, Tab 4.

---

[5] Although the order language at the end of the initial decision indicates that the IRA appeal was dismissed, ID at 18, it is apparent from the administrative judge's finding of jurisdiction that the actual disposition of the appeal was a denial of the appellant's request for corrective action on the merits.

**ANALYSIS[6]**

¶17     The Board has jurisdiction over an IRA appeal if the appellant has exhausted administrative remedies before OSC and makes nonfrivolous allegations that:   (1) she engaged in whistleblowing activity by making a protected disclosure; and (2) the disclosure was a contributing factor in the agency's decision to take or fail to take a personnel action.  *Yunus v. Department of Veterans Affairs*, [242 F.3d 1367](), 1371 (Fed. Cir. 2001).  In an IRA appeal, the standard for establishing subject matter jurisdiction and the right to a hearing is an appellant's merely asserting a nonfrivolous claim, while the standard for establishing a prima facie case is that of preponderant evidence.  *Langer v. Department of the Treasury*, [265 F.3d 1259](), 1265 (Fed. Cir. 2001).  When an appellant meets her burden to establish a prima facie case of reprisal for whistleblowing, the burden shifts to the agency to prove by clear and convincing evidence that it would have taken the same personnel action(s) absent the appellant's whistleblowing.  *Scoggins v. Department of the Army*, [123 M.S.P.R. 592](), ¶ 26 (2016).

The appellant fully exhausted all her claims before OSC and established the Board's jurisdiction over her appeal.

¶18     The Board has recently clarified the substantive requirements of exhaustion. *Chambers v. Department of Homeland Security*, [2022 MSPB 8](), ¶¶ 10-11.  The requirements are met when an appellant has provided OSC with sufficient basis to pursue an investigation.  The Board's jurisdiction is limited to those issues that have been previously raised with OSC.  However, an appellant may provide a more detailed account of whistleblowing activities to the Board than she did to OSC.  An appellant may establish exhaustion through her initial OSC complaint, evidence that she amended the original complaint, including but not limited to

---

[6] We have reviewed the relevant legislation enacted since the filing of this appeal and find that it does not impact the outcome.

OSC's determination letter and other letters from OSC referencing any amended allegations, and the appellant's written responses to OSC referencing the amended allegations. An appellant may also establish exhaustion through other sufficiently reliable evidence, such as an affidavit or declaration attesting that the appellant raised with OSC the substance of the facts in the Board appeal. *Id*.

¶19 Here, while the administrative judge correctly found that the appellant established exhaustion before OSC regarding her disclosure of the erroneous audit report, the administrative judge further found that the appellant "failed to show that she provided OSC with sufficiently clear and precise information about her remaining disclosures." ID at 11. The administrative judge recognized that OSC acknowledged receiving additional information in response to its initial determination, but she found that the appellant failed to establish what that additional information comprised. ID at 7. However, it appears that the appellant included with her initial MSPB appeal copies of her additional disclosures as attachments to her response to OSC's initial determination. IAF, Tab 1 at 12, 17-45. We find that the appellant's submissions were adequate to provide OSC with a sufficient basis to pursue an investigation. Accordingly, we find that the appellant fully exhausted all her claims before OSC.

¶20 We agree with the administrative judge that the appellant nonfrivolously alleged that she made at least one protected disclosure that was a contributing factor in the challenged personnel action. ID at 11-12. Accordingly, the administrative judge properly found that the appellant established jurisdiction over her IRA appeal.

The appellant established that she made protected disclosures.

¶21 On the merits of the appellant's reprisal claims, the administrative judge found that the appellant failed to establish either that her disclosures about the erroneous 2010 audit report were protected or that they were a contributing factor in the AIGA's decision to restrict the scope of the appellant's audit work beginning in February 2013. ID at 12-15. Having found that the appellant failed

to exhaust her administrative remedies as to her other disclosures, the administrative judge did not address those disclosures on the merits.

¶22 In considering whether the disclosures about the deficient 2010 audit report were protected, the administrative judge found that the appellant did not establish by preponderant evidence that she reasonably believed that her disclosures evidenced any violation of any law, rule, or regulation; or gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety. ID at 13-14; *see* 5 U.S.C. § 2302(b)(8)(A). In part, the administrative judge relied on the Department of Transportation (DOT) OIG employees' finding that the 2010 report at issue in this appeal did not need to be recalled and reissued. ID at 13. However, any such finding by the DOT OIG is not dispositive of whether the appellant's initial belief—that posting an erroneous report constituted a rule violation—was reasonable. IAF, Tab 24 at 7. As SBA's OIG itself noted in its pleadings, its audits must "comply with standards established by [GAO's] Comptroller General." *Id.* at 10. We find that the GAO audit standards constitute "rules" for the purposes of 5 U.S.C. § 2302(b)(8). A central pillar of the GAO auditing standards is reducing "the risk that auditors will not detect a mistake, inconsistency, significant error, or fraud in the evidence supporting the audit," and "[a]uditors should determine the overall sufficiency and appropriateness of evidence to provide a reasonable basis for the findings and conclusions[.]" GAO, Government Auditing Standards, GAO-12-331G, ch. 6, ¶¶ 6.05, 6.69 (Dec. 2011), https://www.gao.gov/assets/gao-12-331g.pdf. Additionally, SBA's OIG has its own audit policies, which we find also constitute "rules" for the purposes of 5 U.S.C. § 2302(b)(8). IAF, Tab 1 at 77.

¶23 Moreover, that SBA OIG engaged DOT OIG for a "special quality assessment review" through the lens of its 2010 auditing policies and procedures indicates that the appellant's concerns were not unreasonable. IAF, Tab 24 at 7, 20-21, 31-32. That the appellant's disclosures regarding the report resulted in remedial revisions to the SBA OIG's audit process further highlights the

significance of the issues she raised. *Id.* at 20-21, 32. Furthermore, the appellant alleged that the SBA OIG had provided misleading testimony to Congress based on the report. *Id.* at 28-29. The same criminal statute prohibiting "materially false, fictitious, or fraudulent statement[s] or representation[s]" to OIG employees, or "falsif[ying], conceal[ing], or cover[ing] up by any trick, scheme, or device a material fact," applies to OIG employees themselves—both in their reports and their appearing before Congress.[7]  18 U.S.C. § 1001(a). We therefore find that the appellant established by preponderant evidence that a reasonable person could believe—particularly prior to receiving the results of the DOT OIG review—that her disclosures about the audit reports evidenced a violation of law, rule, or regulation, and that those disclosures were thereby protected.[8]

Remand is necessary to determine if the appellant has established that her protected disclosures were a contributing factor in the agency's taking a covered personnel action against her.

¶24      The term "contributing factor" means any disclosure that influences an agency's decision to threaten, propose, take, or not take a personnel action regarding the individual making the disclosure. *Usharauli v. Department of Health and Human Service*s, 116 M.S.P.R. 383, ¶ 31 (2011); 5 C.F.R. § 1209.4(d). The most common way of proving the contributing factor element is the "knowledge/timing test." *Chavez v. Department of Veterans Aff*airs, 120 M.S.P.R. 285, ¶ 27 (2013). Under that test, an appellant can prove that a disclosure was a contributing factor in a personnel action through evidence that the official taking the personnel action knew of the whistleblowing disclosure and took the personnel action within a period of time such that a reasonable person

---

[7] Significantly, whether the 2010 report needed to be recalled appears to have hinged on whether the omissions and inaccuracies were "material" to the report's findings and recommendations. IAF, Tab 24 at 20, 31-32.

[8] With this finding, we need not decide whether the appellant's subsequent disclosures to CIGIE and to Congress, which took place after the DOT OIG review found it unnecessary to reissue the 2010 report, were protected.

could conclude that the disclosure was a contributing factor in the personnel action. *Id*. Satisfying the knowledge/timing test demonstrates that a protected disclosure was a contributing factor in a personnel action. *Gonzalez v. Department of Transportation*, 109 M.S.P.R. 250, ¶ 20 (2008).

¶25    The appellant indicated in her OSC complaint that the AIGA knew about her disclosures to CIGIE and Congress through the Inspector General. IAF, Tab 11 at 57-58. The Inspector General declared under penalty of perjury that she learned of allegations to the CIGIE Integrity Committee based on a letter from the committee, but that it did not identify the individual who made the allegations. IAF, Tab 24 at 33. The AIGA declared under penalty of perjury that he was not aware of the appellant's disclosures until she appealed to the Board. IAF, Tab 13 at 20. The administrative judge found that the appellant failed to prove that anyone who was involved in the personnel action was aware of her disclosures before that action was taken. ID at 14-15. On review, the appellant argues that both the Inspector General and the AIGA must have known about her disclosures earlier, in part because they were both heavily involved in CIGIE activities. PFR File, Tab 1 at 15. She also argues that the Inspector General must have known about her disclosures to Congress because the Inspector General was "confirmed by Congress." *Id*. However, there is no evidence that either official was involved in the CIGIE Integrity Committee to which the appellant made her disclosures, nor is there evidence that anyone who was involved in CIGIE activities necessarily would have been aware of those disclosures. Similarly, there is no evidence that Congress would have shared the appellant's disclosures with the Inspector General simply because she had been confirmed.

¶26    Nevertheless, the aforementioned communications outside of the appellant's agency were not her first disclosures about the deficiencies in the 2010 audit report. Specifically, the appellant's interactions with the CPG Director on the issue began in 2011. IAF, Tab 24 at 29. As recounted by the administrative judge, the appellant alleged having shared her concerns with the CPG Director

and the AIGA at least as early as February 2012. ID at 4; IAF, Tab 24 at 25-26. Subsequently, the appellant met with the Inspector General to discuss the allegedly deficient audits and other concerns, and she followed up with a letter. IAF, Tab 24 at 25; ID at 4. Overall, as the SBA OIG acknowledges in its pleadings, the agency "was well aware of Appellant's concerns prior to her disclosure of the same concerns to the CIGIE Integrity Committee." IAF, Tab 24 at 20. Accordingly, we find that the appellant did in fact put her supervisors on notice of her disclosures about deficient audits. We further find that the personnel action that the agency took on February 4, 2013—that is, the AIGA's decision informing the appellant that she was no longer to conduct any audit work involving the Office of Credit Access or its subordinate organizations—occurred within a period of time such that a reasonable person could conclude that the appellant's protected disclosures were a contributing factor in that personnel action. Thus, we find that, under the knowledge/timing test, the appellant established that her disclosures regarding the erroneous audit report were a contributing factor in the personnel action taken against her. *Mastrullo v. Department of Labor*, 123 M.S.P.R. 110, ¶¶ 18, 21 (2015).

¶27 The final hurdle to the appellant's establishing a prima facie showing of retaliation for whistleblowing is to prove that the agency's action is a covered personnel action. As is relevant here, a "personnel action" is defined under the WPA as a significant change in duties, responsibilities, or working conditions. 5 U.S.C. § 2302(a)(2)(A)(xii). As noted, the personnel action at issue is the agency's decision that the appellant was not to conduct any further audit work involving the Office of Credit Access or its subordinate organizations.

¶28 To meet the burden of proof in this regard, the appellant must provide sufficient information and evidence for the Board to determine whether the agency's alleged action or actions were "significant." *See Shivaee v. Department of the Navy*, 74 M.S.P.R. 383, 388-89 (1997). The Board has recently clarified this requirement, stating that only agency actions that, individually or

collectively, have practical and significant effects on the overall nature and quality of an employee's working conditions, duties, or responsibilities will be found to constitute a covered personnel action under section 2302(a)(2)(A)(xii). *Skarada v. Department of Veterans Affairs*, 2022 MSPB 17, ¶ 16.

¶29    The administrative judge failed to make a finding on this issue. Given the Board's recently-issued guidance and the findings we have made above, we deem it appropriate to remand this case to allow the administrative judge to determine if the appellant has established that she suffered a significant change in duties, responsibilities, or working conditions when, beginning on February 4, 2013, the agency restricted her ability to perform certain audit work.[9] If, on remand, the administrative judge finds that the appellant has failed to establish that she suffered a covered personnel action under section 2302(a)(2)(A)(xii), the administrative judge shall issue a new initial decision denying corrective action. If, however, the administrative judge finds that the appellant does make such a showing, thereby establishing a prima facie case of whistleblower retaliation, the administrative judge must then determine if the agency has established by clear and convincing evidence that it would have taken the same personnel action absent the appellant's protected disclosures.[10] *Scoggins*, 123 M.S.P.R. 592, ¶ 28.

---

[9] The administrative judge may, in her discretion, allow the parties to present further documentary evidence on this issue.

[10] If necessary, the administrative judge shall consider whether the additional disclosures we have found were exhausted with OSC, including inappropriate behavior by the AIGA, were protected and a contributing factor to the covered personnel action.

## **ORDER**

¶30    The appeal is remanded for further adjudication in accordance with this Order.


FOR THE BOARD:                          /s/ for
                                   Jennifer Everling
                                   Acting Clerk of the Board

Washington, D.C.